230 P.3d 245 (2010)
STATE of Washington, Respondent,
v.
Maurice M. McDANIEL and Direce Christopher Marlow, Appellants.
Nos. 37323-8-II, 37326-2-II.
Court of Appeals of Washington, Division 2.
April 28, 2010.
*249 Nancy P. Collins, Washington Appellate Project, Seattle, WA, Anne Mowry Cruser, Law Office of Anne Cruser, Vancouver, WA, for Appellants.
Melody M. Crick, Pierce County Prosecuting Attorney, Tacoma, WA, for Respondent.
VAN DEREN, C.J.
¶ 1 In this consolidated appeal, Maurice McDaniel appeals his convictions for attempted first degree murder,[1] first degree robbery,[2] both with firearm enhancements, and first degree unlawful possession of a firearm.[3] Direce Marlow appeals his convictions as an accomplice to McDaniel's first degree robbery, with a firearm enhancement, and first degree unlawful possession of a firearm. Both defendants argue that (1) the trial court erred by admitting hearsay evidence of their nicknames, thus violating their Sixth Amendment[4] right to confrontation; (2) the trial court abused its discretion by refusing to sever the unlawful possession of firearm charges; and (3) their counsel were ineffective. McDaniel also contends that the trial court abused its discretion by admitting evidence of his purported flight and by refusing his proposed premeditation jury instruction.[5] Marlow contends that the evidence *250 was insufficient to support an accomplice conviction for first degree robbery.
¶ 2 We hold that the trial court violated the confrontation clause in admitting evidence of McDaniel's nickname and abused its discretion in admitting evidence of his purported flight and resisting arrest. Because these errors were not harmless, we vacate McDaniel's convictions and remand for a new trial. We affirm Marlow's convictions.

FACTS

I. Shooting and Robbery
¶ 3 Early in the morning, on July 29, 2006, Officer Stanley James of the Tacoma Police Department was on patrol in the south end of Tacoma, Washington. At 3:19 am, he heard four or five gunshots originate a few blocks away. As he drove in the general direction of the gunshots, radio dispatch notified him of a shooting at 45th Street and Lawrence Street  an area known for its high crime rate.
¶ 4 When James arrived on the scene, he saw an approximately 30 year old male with gunshot wounds to his abdomen. The man told police that he was Ricky Richardson, but law enforcement later identified him as Cashundo Banks.[6] Banks said that his assailants drove a dark colored sports utility vehicle (SUV).
¶ 5 Earlier that night, Banks drank a few beers and had recently used cocaine, methamphetamine, and marijuana. Around 3:00 am on July 29, Banks was riding his bicycle in the area, seeking to purchase marijuana, when he saw a parked Chevrolet Blazer with tinted windows that had two unfamiliar African American males sitting in the front seats.[7] Banks approached the men in the SUV and asked if they had any marijuana for sale. The passenger said that he did and told Banks to follow them.
¶ 6 The vehicle drove one block up the street and Banks followed. When the door opened, the passenger exited the vehicle with a gun in his hands. Banks saw the gun and gave the passenger his money, but the passenger shot Banks repeatedly. Then the vehicle sped away.
¶ 7 Banks underwent emergency surgery for multiple wounds. His toxicology test was positive for cocaine, methamphetamine, and marijuana. He also had a blood alcohol level of .176. Nine days later, he left the hospital against medical advice, presumably to avoid arrest.
¶ 8 While investigating an unrelated crime, Detective Gene Miller of the Tacoma Police Department obtained a search warrant for telephone calls made to Marlow's telephone number between July 5, 2006, and September 5, 2006, by Verrick Yarbrough, an inmate at the Pierce County Jail. After listening to over 70 hours of taped conversation, Miller realized that three individuals were discussing a shooting on 45th Street. When Miller searched police records, he discovered only one reported shooting on 45th Street during that period  the July 29th shooting at 45th Street and Lawrence Street. On the tape, "Reese," "Tony Guns," and Yarbrough sounded as if they were bragging about the shooting and talked about the victim with callous disregard for the injuries they inflicted. Report of Proceedings (RP) (Dec. 4, 2007) at 772-73. After speaking to at least four people, Miller concluded that "Reese" was Marlow and that "Tony Guns" was McDaniel.
¶ 9 Miller spoke with Banks in jail on April 10, 2007, after police arrested him on unrelated charges. Banks described his assailants to Miller. Miller showed Banks two separate photomontages  one with Marlow and one with McDaniel. Banks identified Marlow as the driver of the vehicle and McDaniel as the shooter.
¶ 10 In May, Tacoma police conducted a stake out to arrest McDaniel on several warrants. They received information from a citizen witness that McDaniel and his girl friend had entered a vehicle. When the vehicle *251 drove onto the road, with the girl friend driving, officers activated their emergency lights and pulled it over. As a police officer stepped out of his car, the vehicle sped away. Five marked patrol cars chased it at high speed and ultimately rammed the vehicle, bringing it to a stop. When McDaniel exited the vehicle from the passenger side, officers instructed him to show his hands and lie down, which he refused to do. Police forced him to the ground and arrested him. He did not throw punches or otherwise fight back.[8]
¶ 11 The State charged both Marlow and McDaniel with attempted first degree murder, first degree robbery, and first degree unlawful possession of a firearm. The attempted murder and robbery counts carried firearm enhancements.

II. Trial Proceedings
¶ 12 During a hearing on a motion in limine before trial, Miller testified about his experience with gangs and his investigation of the 70 hours of recorded jail telephone calls between Yarbrough, "Reese," and "Tony Guns." The State argued that Miller had firsthand knowledge that Marlow was "Reese" and McDaniel was "Tony Guns" and that Miller should be able to testify to these nicknames. The trial court agreed with the State, rejecting the defendants' confrontation clause arguments.[9]
¶ 13 Both defense counsel unsuccessfully moved to sever the defendants' unlawful possession of firearms charges from the remaining charges, arguing that it would be unduly prejudicial if all counts were tried together. McDaniel's counsel unsuccessfully moved to exclude testimony regarding his arrest and purported flight.
¶ 14 The jury convicted McDaniel as charged. The jury convicted Marlow of first degree robbery, with a firearm enhancement, and first degree unlawful possession of a firearm. But the jury could not reach a verdict on Marlow's attempted first degree murder count and the trial court declared a mistrial on that count.
¶ 15 We consolidated Marlow's and McDaniel's appeals.

ANALYSIS

I. Confrontation Clause
¶ 16 Marlow and McDaniel argue that the State violated their Sixth Amendment confrontation rights because Miller lacked personal knowledge that they used the names "Reese" and "Tony Guns," respectively. They contend that Miller merely repeated testimonial out-of-court statements because he had interrogated and interviewed third parties, specifically to identify who used the nicknames he heard used on the jail telephone recordings. We hold that Miller had firsthand personal knowledge that Marlow was "Reese" but that Miller's testimony regarding McDaniel constituted testimonial evidence in violation of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and its progeny.

A. Standard of Review
¶ 17 We review alleged confrontation clause violations de novo. State v. Kronich, 160 Wash.2d 893, 901, 161 P.3d 982 (2007).

B. Challenged Rulings
¶ 18 Before trial, the State moved to admit the recorded jail telephone conversations and to designate Miller as a gang expert. During a motion in limine, Miller implied that he learned the defendants' nicknames through his investigation but he did not testify about the specific sources of his information. McDaniel's counsel objected based on, among other things, the confrontation clause:
And there are major confrontational clause problems that arise with Detective Miller testifying to information that he's learned from other people, because those people aren't over here to testify. Those people aren't available for the defense to cross-examine. For all we know, those people may have been just letting Detective Miller *252 hear what they wanted him to hear, either to put him in the wrong direction or whatever. We don't know why those individuals told Detective Miller what they told Detective Miller. We don't even know what the exact words were that those other individuals used when they spoke with Detective Miller.
RP (Nov. 15, 2007 am) at 166.
¶ 19 The trial court overruled this argument:
[McDaniel's counsel] suggests that, well, maybe the people [Miller] was talking to were just leading him astray and all he's got is a whole bunch of faulty information, but I think the length of time [Miller]'s been involved with [his investigation] and the depth and number of people he's talked to has given him ample opportunity to kind of cross-reference what he's being told, and it would be pretty obvious if you are being led down a garden path when you have the breadth of information that he's got available. I don't find that this is like nuclear physics, where you would rely on treatises and experiments to form your basis of knowledge. This is real-life experience that is found best in the real world, so I find that this is both reliable, given the breadth and length of time that it's been available to him, and that it's the kind of thing that an expert would rely on to form an opinion. So, I do find that he has the requisite experience.
RP (Nov. 15, 2007 am) at 171-72. In so ruling, the trial court apparently qualified Miller as a gang expert under ER 702,[10] though it did not explicitly do so.
¶ 20 The trial court also ruled that Miller could not testify to specific out-of-court statements:
I have already indicated that [Crawford], itself, doesn't prohibit this type of testimony, because we are talking about his ability to relate gang culture. But, if he's relating specific statements of other people and he doesn't have firsthand information, then maybe it is a [Crawford] issue, but that doesn't take all the gang-related testimony out of the case.
RP (Nov. 15, 2007 am) at 183.
¶ 21 In the continuing motion in limine hearing, Miller testified in an offer of proof about the jail telephone call tape recordings. Miller explained that he connected Marlow to the nickname "Reese" through (1) a photograph of Marlow with "Reese" written on it that was found at Marlow's apartment based on an unchallenged search warrant; (2) the fact that the taped telephone calls from the jail went to Marlow's residence; and (3) the logical shortening of Direce to "Reese." Miller also testified that he connected McDaniel to "Tony Guns" by questioning at least four people, including Yarbrough's former girl friend and a fellow gang member arrested on an unrelated homicide. In addition, Miller relied on the fact that he heard "Tony Guns" was "kicked out of his grandma's place for getting caught with a weapon," which matched Miller's information that McDaniel had lived with his grandmother. RP (Nov. 27, 2007) at 27.
¶ 22 Following the second hearing, Marlow's counsel moved to exclude testimony concerning the names "Reese" and "Tony Guns." Despite having earlier concluded that Miller could not repeat the statements of others, the trial court ruled:
Now, is there a linkage to suggest that Tony Guns and Reese are actually McDaniel and Marlow? Well, again, there are references by a number of people that identify Mr. McDaniel as Tony Guns, and Mr. Marlow as Reese. Further, the calls made to Mr. Marlow's residence, the shortening of Reese is logical from the name Direce. The circumstances suggest that there is a linkage. This conversation is done in a relatively close time to the shooting, itself. The two defendants know each other. Mr. Banks has picked them out as the people that shot him, and the subject matter is similar to the subject matter at hand. And so all of that together suggests *253 that there is sufficient evidence to support the State's theory.
....
... So what I am not going to let [Miller] do is get on and talk about his conclusions as to ultimate questions of fact. For instance, he is not going to be able to get on and say, yes, speaker one in conversation No. 1 is Tony Guns, and Tony Guns is Mr. McDaniel, and Mr. McDaniel is seated right over there, and furthermore, Mr. McDaniel was involved in this shooting. That's about what the State would probably argue would be the end of what he could logically do, and they, maybe, wouldn't even say he was involved in the shooting.
But what he can do, and maybe this is a distinction that brings no comfort to the defense at all, but I think it's the way to look at this is, he can say, I have listened to all the tapes. If you listen to all the tapes, it's clear that the person speaking, because of all the reasons I have already indicated, is identified as Tony Guns. And I have firsthand knowledge of the fact from the expertise that I have gained, and the people that I have talked to, that Mr. McDaniel uses the nickname of Tony Guns.
RP (Nov. 27, 2007) at 125-28.
¶ 23 After further discussion, both defense counsel renewed their objections:
[MCDANIEL'S COUNSEL]: Your Honor, along that same vein, we are running into confrontation clause issues with the detective, if the detective were to testify as to how he determined.
THE COURT: Well, see, that's a problem. And I don't want, and I have already indicated, the detective to be the conduit for other people's substantive testimony.
[MARLOW'S COUNSEL]: So the detective, is he allowed or not allowed to say, in my opinion speaker one is this guy over here?
THE COURT: No. But he is allowed to say that in listening to the tapes, if you listen to all the tapes, you will hear, for instance, in conversation one, that this starts out by so and so asking for Tony Guns. Mr. Yarbrough asking for Tony Guns. So he can say that the reference to the speaker, that speaker No. 1 is identified as Tony Guns. Tony Guns in my knowledge of this area, is in fact, Mr. McDaniel.
[MARLOW'S COUNSEL]: That was all based on hearsay of witnesses who are not on the witness list, or called to be here.
THE COURT: Well, let's say this: The nickname Tony Guns is associated with Mr. McDaniel, he knows that to be a fact, and it's not  now, don't  I know where you are going, and I am trying to draw a line, and I have already indicated you are not going to like the line I am drawing, but he knows that as a matter of fact from having talked to people in the community, from having gathered this expert information.
[MCDANIEL'S COUNSEL]: Your Honor, if the Court is inclined towards allowing this type of evidence in, which is highly questionable evidence, that obviously, violates our right to confront those witnesses. Then I would ask the Court to at least say that if he is going to make any reference, that it should be as somebody who I believed to be Tony Guns.
THE COURT: I am not even saying he gets to say he believes it. I am saying that he can say there is reference, or there is an association between the nickname Tony Guns and Mr. McDaniel.
[MCDANIEL'S COUNSEL]: Your Honor, it still is confusing. It's going to lead the jury to believe that, in fact, Mr. McDaniel is Tony Guns.
THE COURT: Well, that's the purpose of the State's evidence is to convince the jury that Mr. McDaniel is, in[]deed, Tony Guns. That's what they are trying to do, and that's evidence to suggest that that is exactly right.
[MCDANIEL'S COUNSEL]: However, there [are] the confrontation clause issues, so rather than saying it's associated with Mr. McDaniel, that he could say that he believes that there is some association.
THE COURT: He has firsthand information, in that he has heard. He is not relaying what other people have said, that so and so says that Mr. McDaniel is Tony *254 Guns. He is saying that he has firsthand information from an immersion in the gang culture to references to Mr. McDaniel as Tony Guns. He has heard Mr. McDaniel referred to as Tony Guns on those tapes. If you perceive that difference, and I perceive it to be a difference, there is a difference between him saying people have told me that he is Tony Guns and saying I have heard him referred to as Tony Guns. That's the difference between firsthand information and what you are saying, which is hearsay information, related from another source.
[MARLOW'S COUNSEL]: So essentially it's an impression, and therefore not hearsay.
THE COURT: It's his firsthand knowledge of people referring to McDaniel as Tony Guns.
[MARLOW'S COUNSEL]: Thank you, Your Honor.
[MCDANIEL'S COUNSEL]: Your Honor, along that vein though, you are talking about immersion, but you have already said he is not going to be allowed to testify as a gang expert.
THE COURT: No, I never said that. I said he can testify as a gang expert. What he can't do is use his expertise to pull together the whole case and say in my opinion, McDaniel and Marlow are guilty of this crime, because I have studied everything.
RP at (Nov. 27, 2007) 142-45.
¶ 24 Accordingly, the trial court ruled that Miller's testimony about the defendants' nicknames constituted firsthand, personal knowledge. But in repeatedly addressing Miller's gang expertise, it appears that the trial court designated Miller as an expert capable of testifying to an opinion or to inferences drawn from data under ER 702 and ER 705,[11] without regard to whether this designation thereby deprived the defense of an opportunity to confront those who told Miller that McDaniel was "Tony Guns."
¶ 25 At trial, the State did not call any of the people with whom Miller spoke as witnesses or elicit from Miller evidence of the defendants' gang membership or general gang information. Miller limited his trial testimony about the defendants' nicknames to the following:
[THE STATE:] And have you heard the name Tony Guns?
[MILLER:] Yes.
[THE STATE:] And where have you heard that name?
[MILLER:] On that jail phone recordings.
[THE STATE:] Is that one of three talkers, I guess, that was discussing the shooting on 45th?
[MILLER:] Yes.
[THE STATE:] Do you know anybody that uses the name Tony Guns?
[MILLER:] Yes.
[THE STATE:] Who?
[MILLER:] Maurice McDaniel.
....
[THE STATE:] Do you know anybody else other than Maurice McDaniel that goes by the name of Tony Guns?
[MILLER:] No.
[THE STATE:] Did you hear at any point the name Reese?
[MILLER:] Yes.
[THE STATE:] In association with the phone calls regarding a shooting?
[MILLER:] Yes.
[THE STATE:] Do you know anybody that goes by the name Reese?
[MILLER:] Yes.
[THE STATE:] And who is that?
[MILLER:] Direce Marlow.
....
[THE STATE:] Do you know anybody else who goes by the name of Reese?
[MILLER:] No.
RP at (Dec. 4, 2007) 772-73. During cross-examination, defense counsel did not ask about the underlying facts or data on which *255 Miller relied to conclude that Marlow and McDaniel were "Reese" and "Tony Guns," as ER 705 allows.

C. Out-of-Court Statements Made under Police Questioning Are Testimonial
¶ 26 The Sixth Amendment to the United States Constitution[12] and article 1, section 22 of the Washington Constitution[13] guarantee criminal defendants the right to confront and cross-examine witnesses. The confrontation clause provides that the State can present testimonial out-of-court statements of an absent witness only if the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 59, 68, 124 S.Ct. 1354. But the State can present nontestimonial hearsay under the Sixth Amendment subject only to evidentiary rules. Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Accordingly, "the existence of an applicable hearsay exception is not dispositive as to the issue of admissibility at trial. Rather, the [c]onfrontation [c]lause requires another layer of analysis." State v. Kirkpatrick, 160 Wash.2d 873, 882, 161 P.3d 990 (2007). The State has the burden on appeal of establishing that statements are nontestimonial. State v. Koslowski, 166 Wash.2d 409, 417 n. 3, 209 P.3d 479 (2009).
¶ 27 Statements made in the course of a police investigation are nontestimonial if the primary purpose of the questioning is to allow police to assist in an ongoing emergency.[14]Davis, 547 U.S. at 822, 126 S.Ct. 2266. But statements are testimonial if the primary purpose of questioning is to establish or prove past events potentially relevant to later criminal prosecution and circumstances objectively indicate that there is no ongoing emergency. Davis, 547 U.S. at 822, 126 S.Ct. 2266 "Statements taken by officers in the course of investigations are almost always testimonial. So are statements that are the product of police-initiated contact." State v. Tyler, 138 Wash. App. 120, 127, 155 P.3d 1002 (2007) (citation omitted).

1. Basis of Miller's Knowledge about the Nickname "Reese"
¶ 28 Here, Miller connected Marlow to the name "Reese" largely based on the diminutive of Direce to "Reese," the photograph of Marlow with the name "Reese," and the fact that Yarbrough's calls went to Marlow's residence. Thus, Miller based his knowledge of Marlow's use of the nickname, "Reese," on firsthand, nonhearsay information and his testimony that "Reese" was Marlow did not violate the confrontation clause.

2. Basis of Miller's Knowledge about the Nickname "Tony Guns"
¶ 29 But Miller's testimony about McDaniel's nickname underscores the tension between the designation of an expert under ER 702, allowing the expert to testify to opinions and inferences, and the protections of the confrontation clause. In ruling that Miller had personal knowledge of McDaniel's nickname, the trial court apparently understood Miller's testimony to fall within the ambit of ER 705  that is, expert testimony regarding inferences made in reliance *256 on information learned during an investigation.
¶ 30 The Second Circuit recently addressed this issue in United States v. Mejia, 545 F.3d 179 (2d Cir.2008). There, a police officer testified as a gang expert, not only about the structure and activities of the gang to which the defendants allegedly belonged, but about particular facts relating to the defendants' crimes. Mejia, 545 F.3d at 186-87. The officer testified to some information that he learned during custodial interrogation of other members of the same gang. Mejia, 545 F.3d at 188 n. 3, 199.
¶ 31 On appeal, the Second Circuit reversed the convictions because the gang expert's testimony "addressed matters that the average juror could have understood had such factual evidence been introduced" and held that it was not "acceptable to substitute expert testimony for factual evidence of murder in the first instance." Mejia, 545 F.3d at 195. We excerpt only part of the court's thorough explanation of this problem:
Yet despite the utility of, and need for, [police gang] expertise of this sort, its use must be limited to those issues where sociological knowledge is appropriate. An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence. If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo"[15] to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them. The officer expert transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.
In such instances, it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict  even more so when that expert happens to be one of the Government's own investigators.
Mejia, 545 F.3d at 190-91. Because the officer in Mejia repeated what he heard from others instead of piecing together and analyzing relevant information for himself, the court held that he based part of his expert testimony on inadmissible hearsay and violated the confrontation clause. 545 F.3d at 198-99.
¶ 32 Here, Miller testified in pretrial hearings that he learned information that led him to believe that McDaniel used the name "Tony Guns" by questioning unidentified people, including, but not limited to, Yarbrough's former girl friend and a fellow incarcerated gang member. At trial, none of the people who identified McDaniel as "Tony Guns" testified. Miller simply identified "Tony Guns" as McDaniel. Based on the way Miller obtained the information, his testimony did not require gang expertise. None of the people with firsthand knowledge of this factual evidence testified at trial and none were subject to defense cross-examination.
¶ 33 The record provided few details about Miller's interviews. He spoke to the gang member in custody with the gang member's defense counsel present. The gang member's statements were clearly testimonial in nature, although we do not know what he said to Miller. See Crawford, 541 U.S. at 53 n. 4, 124 S.Ct. 1354; Tyler, 138 Wash.App. at 127, 155 P.3d 1002. The record does not contain enough information for us to review the identity of the individuals or the nature of the other interviews; thus, the *257 State has not met its burden to establish that these conversations were nontestimonial.
¶ 34 Furthermore, the other information Miller relied on to identify McDaniel as "Tony Guns" is equivocal: Living with extended family is a common occurrence, so information that "Tony Guns" lived with his grandmother does not prove that McDaniel was "Tony Guns." No other evidence corroborated this fact. Finally, the State did not present any witnesses to identify McDaniel's voice on the recordings.
¶ 35 The dissent argues that Miller's testimony fell within the ambit of ER 804(b)(4).[16] Dissent at 264-65. But we reverse McDaniel's convictions and remand for a new trial based on constitutional deficiency, not evidentiary error. Apart from any hearsay question, the confrontation clause requires that we determine whether the evidence was testimonial under Crawford and its progeny. Kirkpatrick, 160 Wash.2d at 882, 161 P.3d 990.
¶ 36 But even if we were to address Miller's recitation of absent witnesses' conclusions about Tony Guns' identity as hearsay, we could not join the dissent's reasoning. Were we to agree that the gang member interviewed in jail, Yarbrough's girl friend, and other unidentified persons were somehow "intimately associated with" McDaniel's family  a questionable extension of ER 804(b)(4) and a particularly difficult conclusion when their identities are not in the record  there was nevertheless no showing that these individuals were "unavailable" for trial. ER 804(b). This rule requires the proponent of such evidence to establish a witness-declarant's unavailability. See State v. DeSantiago, 149 Wash.2d 402, 410-11, 68 P.3d 1065 (2003); Rice v. Janovich, 109 Wash.2d 48, 57-58, 742 P.2d 1230 (1987); Kinsman v. Englander, 140 Wash.App. 835, 840, 167 P.3d 622 (2007). The dissent does not consider the absence of this necessary evidence. Finally, the State could properly elicit testimony that Banks identified a photograph of Maurice McDaniel  the defendant's legal name, not any nickname, as the dissent suggests.
¶ 37 On this record, we must conclude that Miller lacked personal, first-hand knowledge of McDaniel's nickname and that his testimony merely repeated testimonial out-of-court statements that McDaniel was known as "Tony Guns." Therefore, we hold that Miller's testimony regarding McDaniel violated the confrontation clause and that the trial court erred by permitting such identification.

D. Harmless Error
¶ 38 Next, we determine whether Miller's testimony about McDaniel was harmless. "The admission of a hearsay statement in violation of the confrontation clause is a *258 classic trial error. This is so because a reviewing court may evaluate the possible effect of the hearsay statement in the context of all the evidence presented at trial." State v. Watt, 160 Wash.2d 626, 633, 160 P.3d 640 (2007). "[C]onstitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless." Watt, 160 Wash.2d at 635, 160 P.3d 640. "If the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt, the error is harmless." Koslowski, 166 Wash.2d at 431, 209 P.3d 479.
¶ 39 Here, there is compelling evidence that McDaniel was the person who shot Banks. Banks pointed out Marlow as the vehicle's driver and McDaniel as the shooter in the photomontages and at trial.[17]
¶ 40 But the jury also heard constitutionally tainted evidence from Miller, a police officer, that McDaniel was "Tony Guns"  evidence that significantly strengthened the State's case. Even without Banks' testimony, Miller's identification was likely sufficient to convince a jury to convict McDaniel. While the tapes of the telephone calls were admissible in the joint trial to show that they were made to Marlow's residence, the State presented the telephone calls to the jury as confessions by "Reese" and "Tony Guns," thus rendering Miller's testimony highly prejudicial. Had Miller not been allowed to identify McDaniel as "Tony Guns," based on other people's statements, those witnesses would have had to testify and would have been subject to cross-examination.
¶ 41 We hold that, without the unconstitutional evidence, the remaining evidence was not overwhelming that McDaniel was the "Tony Guns" who shot Banks. Accordingly, we reverse McDaniel's conviction and remand for a new trial. We address other issues related to Marlow and those that may arise during a retrial involving McDaniel.

II. Evidence Relating to McDaniel's Arrest
¶ 42 McDaniel next argues that the trial court abused its discretion by admitting evidence of circumstances surrounding his arrest, which he contends did not constitute a flight.[18] We agree.

A. Challenged Ruling
¶ 43 Before trial, McDaniel's counsel moved to suppress any evidence relating to McDaniel's arrest, arguing that it was highly prejudicial with very little probative value. The trial court ruled:
There's lot of evidence that comes in that the trier of fact could look at and say, well, this is just a matter of the girlfriend being scared of the police and driving off; it doesn't reflect badly on Mr. McDaniel, and his lack of cooperation is just a guy that is either protecting his girlfriend or doesn't like the police and was just in a bad mood, and it doesn't mean anything. And if that's the interpretation the jury reaches, so be it.
On the other hand, the jury could look at that same evidence and say, hey, he's in the car, he's got a guilty mind, he's part of a flight, and his lack of cooperation underscores that. That's the kind of thing we impanel juries to do. They make decisions about facts that might be interpreted one way and might be interpreted another, so I am going to deny the request.
RP (Nov. 14, 2007 am) at 63-64.

B. Evidence of Flight and ER 403[19]
¶ 44 "Analytically, flight is an admission by conduct. Evidence of flight is *259 admissible if it creates `a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.'" State v. Freeburg, 105 Wash. App. 492, 497, 20 P.3d 984 (2001) (footnote omitted) (quoting State v. Nichols, 5 Wash. App. 657, 660, 491 P.2d 677 (1971)). Our law does not define what circumstances constitute flight, so "evidence of resistance to arrest, concealment, assumption of a false name, and related conduct are admissible" if the trier of fact can reasonably infer the defendant's consciousness of guilt of the charged crime. Freeburg, 105 Wash.App. at 497-98, 20 P.3d 984.
¶ 45 Such evidence "tends to be only marginally probative as to the ultimate issue of guilt or innocence[, so] the circumstance or inference of consciousness of guilt must be substantial and real, not speculative, conjectural, or fanciful." Freeburg, 105 Wash.App. at 498, 20 P.3d 984. We will not accept "[p]yramiding vague inference upon vague inference [to] supplant the absence of basic facts or circumstances from which the essential inference of an actual flight must be drawn." State v. Bruton, 66 Wash.2d 111, 113, 401 P.2d 340 (1965).
[T]he probative value of evidence of flight "as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."
Freeburg, 105 Wash.App. at 498, 20 P.3d 984 (quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977)). Fundamentally, an inference of flight requires evidence of volitional behavior by the defendant, not another person.[20]See Freeburg, 105 Wash. App. at 498, 20 P.3d 984.
¶ 46 Here, the circumstances of McDaniel's arrest do not appear to support the first of Freeburg's four inferences  that McDaniel's behavior caused the purported flight. McDaniel was not driving the vehicle  his girl friend was. Nothing in the record suggested that she fled law enforcement under his command, so this evidence forced jurors to speculate what he did or did not tell her. We can just as easily suppose that her actions demonstrated her consciousness of guilt or fear of arrest.
¶ 47 The State highlights McDaniel's refusal to cooperate with police after they rammed the vehicle in which he was driven. But evidence that he resisted arrest is admissible only if the jury can infer consciousness of guilt of the charged crimes, which occurred nine months earlier. See Freeburg, 105 Wash.App. at 498, 20 P.3d 984. And the record reveals that McDaniel was wanted on several warrants, not just the one related to this incident.
¶ 48 We conclude that evidence of the police chase and arrest had limited probative value and an unfair danger of prejudice because nothing demonstrated that McDaniel's flight was volitional. Evidence of his unruly arrest was a closer question but nevertheless unfairly prejudicial under these circumstances. This evidence did not allow a direct inference as to McDaniel's consciousness of guilt for shooting Banks. Thus, we hold that the trial court abused its discretion in admitting evidence of the police chase and his *260 actions in resisting arrest and such evidence will not be permitted at retrial.

III. McDaniel's Jury Instruction Challenges
¶ 49 McDaniel also challenges two jury instructions that he claims deprived him of a fair trial. First, he claims that the to-convict instruction for attempted first degree murder, number 14, was flawed because it did not require the jury to find a premeditated, deliberate intent. Second, he maintains that the premeditation instruction, number 12, inaccurately defined premeditation. He argues that these instructions did not adequately clarify the difference between premeditation and intent.
¶ 50 But absent a claim of constitutional magnitude, we may refuse to address on appeal any specific claim of error that a party did not raise in the trial court. RAP 2.5(a). A party objecting to a jury instruction must "state the reasons for the objection, specifying the number, paragraph, and particular part of the instruction to be given or refused." CrR 6.15(c). Where objection to "a proposed instruction fail[ed] to advise the trial court of any particular point of law involved," we will not consider those arguments on appeal. State v. Scherer, 77 Wash.2d 345, 352, 462 P.2d 549 (1969).
¶ 51 Here, Marlow took exception to instruction 12. Although he noted that he "had processed some language" from a federal case that he thought the trial court should incorporate, he never stated what that language was or otherwise articulated the basis of his objection. RP (Dec. 6, 2008) at 1084. McDaniel joined this vague objection but neither proposed an alternative instruction. McDaniel's counsel did not challenge instruction 14. As such, McDaniel waived any appeal on instructions 12 and 14.[21]

IV. Motion to Sever Charges and Ineffective Assistance of Counsel
¶ 52 Marlow and McDaniel claim that the trial court's refusal to sever their first degree unlawful firearm possession charges constituted an abuse of discretion.[22] McDaniel also argues that the trial court's failure to give the promised limiting instruction, combined with its refusal to sever, denied him a fair trial. We disagree with all of these contentions.

A. Standard of Review
¶ 53 We review a trial court's refusal to sever charges for an abuse of discretion. State v. Bythrow, 114 Wash.2d 713, 717, 790 P.2d 154 (1990). "A claim of ineffective assistance of counsel presents a mixed question of fact and law reviewed de novo." State v. Sutherby, 165 Wash.2d 870, 883, 204 P.3d 916 (2009).

B. Challenged Rulings
¶ 54 Both defense counsel moved to sever the unlawful firearm possession charge from the remaining charges. Defense counsel did not brief the motion and the trial court said that it would consider only filed briefs. The trial court allowed defense counsel another chance to provide authority on the issue before swearing in the jury.
¶ 55 The next day, neither defense counsel submitted any briefing but they nevertheless *261 argued for severance of the unlawful possession charges. The trial court ruled:
All right. As to the question of it not being timely, and/or not fully briefed, I am going to assume since [CrR 4.4] allows for this to be brought anytime during the trial, that it is timely. Although, it's presented in a way certainly that doesn't give the Court the advantage of full briefing, or being able to consider it at the Court's leisure. I think the lack of briefing has got to work against the defense, and certainly at this juncture I haven't been presented any case authority that suggests that this is other than an area of discretion that the Court has.
In looking at the merits of it, we know that separate trials are not favored for a couple of reasons, one of which is judicial economy and preservation of resources. A second is when you start chopping cases up into pieces, you end up getting results that become inconsistent, and thereby, can be unfair to one or all parties.
The other factors the Court is to look to are the relative strengths of the State's evidence with regard to the varying counts. And it appears to me that the strengths are very similar with regard to the firearms count, as opposed to the other counts. The evidence that's conceded is virtually identical, except for the existence of the underlying juvenile charge. In looking at the fact that it's a juvenile conviction, I note that 609[23] does not exclude all juvenile convictions. It says that juvenile adjudications are generally not admissible, but for a fair adjudication, they can be utilized.
So it's not an all or nothing situation. I don't think the fact that they are not admissible under 609 necessarily, though, even answers the question of whether or not it's appropriate to bring them up under another theory, which is as an element of a crime. So there are different considerations there.
Finally, I note that as the State has pointed out, there is the intent to give a limiting instruction. So for all those reasons, I don't find it appropriate to sever the firearms counts.
RP (Nov. 28, 2007) at 193-95. The defendants failed to renew their severance motions during trial.

C. Preservation of Issues
¶ 56 CrR 4.4(a) provides:
(1) A defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require. Severance is waived if the motion is not made at the appropriate time.
(2) If a defendant's pretrial motion for severance was overruled he may renew the motion on the same ground before or at the close of all the evidence. Severance is waived by failure to renew the motion.
Here, whereas the defendants timely moved to sever their unlawful firearm possession charges, it appears that they failed to renew their motions before or at the close of all the evidence. Accordingly, we hold that this issue is waived and address it only within the discussion of ineffective counsel.

D. Ineffective Assistance of Counsel
¶ 57 Marlow and McDaniel claim that their counsel were ineffective by failing to (1) provide the trial court authority for severing the unlawful possession of firearm counts or (2) request a limiting instruction that evidence of their prior convictions was admissible only for the purposes of the unlawful possession charges. They argue that judicial economy did not outweigh the prejudice because the trial court could have held a "bench trial following the jury trial on the other charges, at which the court could decide whether the prosecution proved first degree unlawful possession as charged."[24] *262 Br. of Appellant (McDaniel) at 15. They attack the trial court's reasoning that "when you start chopping cases up into pieces, you end up getting results that become inconsistent." RP (Nov. 28, 2007) at 194. These claims fail.
¶ 58 When a defendant argues ineffective assistance of counsel, he must show that his counsel's performance was deficient and resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995). "To show deficient representation, the defendant must show that it fell below an objective standard of reasonableness based on all the circumstances." State v. Nichols, 161 Wash.2d 1, 8, 162 P.3d 1122 (2007). He must overcome our strong presumption that his counsel represented him adequately and effectively, possibly by showing the absence of a legitimate strategic or tactical basis for the challenged conduct. See Nichols, 161 Wash.2d at 8, 162 P.3d 1122; McFarland, 127 Wash.2d at 335-36, 899 P.2d 1251. "In assessing performance, `the court must make every effort to eliminate the distorting effects of hindsight.'" Nichols, 161 Wash.2d at 8, 162 P.3d 1122 (quoting In re Pers. Restraint of Rice, 118 Wash.2d 876, 888, 828 P.2d 1086 (1992)). To demonstrate prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." Nichols, 161 Wash.2d at 8, 162 P.3d 1122.
¶ 59 Washington law disfavors separate trials. State v. Medina, 112 Wash. App. 40, 52, 48 P.3d 1005 (2002). "Severance of charges is important when there is a risk that the jury will use the evidence of one crime to infer the defendant's guilt for another crime or to infer a general criminal disposition." Sutherby, 165 Wash.2d at 883, 204 P.3d 916. Marlow and McDaniel must demonstrate that submission of their counsel's briefing and a limiting instruction were necessary to avoid a trial that "would be so manifestly prejudicial as to outweigh the concern for judicial economy." Bythrow, 114 Wash.2d at 718, 790 P.2d 154.
¶ 60 Four factors mitigate prejudice to the accused, none of which is dispositive: "`(1) the strength of the State's evidence on each count; (2) the clarity of the defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.'" Sutherby, 165 Wash.2d at 884-85, 204 P.3d 916 (quoting State v. Russell, 125 Wash.2d 24, 63, 882 P.2d 747 (1994)); see State v. Warren, 55 Wash.App. 645, 655, 779 P.2d 1159 (1989). Regarding this last factor, the trial court need not sever counts just because evidence is not cross admissible. State v. Markle, 118 Wash.2d 424, 439, 823 P.2d 1101 (1992).
¶ 61 Here, the trial court properly ruled on Marlow's and McDaniel's motions to sever without the requested briefing and made the proper analysis. In considering the relative strength of the State's evidence, we agree with the trial court's finding that evidence on the several counts was similarly incriminating. And had the defendants not both stipulated to an element of first degree unlawful possession of a firearm  that they had "previously been adjudicated guilty of a felony as a juvenile, defined as a serious offense"  the State apparently had solid evidence of their prior convictions. RP (Nov. 28, 2007) at 227-28. The second consideration also weighs against Marlow and McDaniel because their defenses  general denial  were clear to the jury.
¶ 62 With respect to the third factor, the trial court agreed to give a specific limiting instruction but did not do so. But the trial court instructed the jury that "[a] separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Clerk's Papers (McDaniel) at 40. Our courts have repeatedly approved and relied on essentially the same instruction in upholding decisions denying severance. Bythrow, 114 Wash.2d at 723, 790 P.2d 154; State v. Cotten, 75 Wash. App. 669, 688 & n. 14, 879 P.2d 971 (1994). And we presume that jurors follow instructions. State v. Lough, 125 Wash.2d 847, 864, 889 P.2d 487 (1995).
*263 ¶ 63 Regarding cross admissibility, Marlow and McDaniel argue that evidence of their juvenile convictions would prejudice the jury to believe they were criminals anyway, with a propensity to commit violent crimes. Juvenile convictions are presumed inadmissible and very prejudicial because a jury could view them as propensity evidence. ER 609(d); State v. Hardy, 133 Wash.2d 701, 706, 946 P.2d 1175 (1997). But the State made little use of Marlow's and McDaniel's prior convictions. In fact, following the stipulations at the trial's opening, no one mentioned them until Marlow's closing argument.
¶ 64 On balance, severance was not necessary because the prejudice was significantly ameliorated. The evidence was easy for a jury to compartmentalize and the trial court minimized prejudice through its instructions. The record as a whole demonstrates that counsel represented Marlow and McDaniel aggressively and effectively, successfully convincing the trial court to redact the audio recordings and exclude all evidence of the defendants' gang memberships.[25] Before trial, defense counsel argued the severance issue by calling the trial court's attention to CrR 4.4 and ER 609 and explaining the prejudice that Marlow and McDaniel claimed.[26] And it appears that they may have had tactical reasons not to ask for a limiting instruction, namely, to not call attention to the incriminating stipulation. Furthermore, because the jury deliberated for days and ultimately could not decide Marlow's attempted murder count, these stipulations did not appear to unduly prejudice jury deliberations. As such, we hold that Marlow and McDaniel cannot establish either legal prong and that their claims of ineffective assistance fail.

V. Sufficiency of the Evidence that Marlow was an Accomplice
¶ 65 Marlow next argues that the State's evidence was insufficient to convict him as an accomplice to McDaniel's first degree robbery. Specifically, he contends that there was no evidence that McDaniel told Marlow that he planned to rob Banks, rather than sell him drugs.[27] We disagree.

A. Standard of Review
¶ 66 When reviewing a challenge to the sufficiency of the evidence, we determine whether any rational fact finder could have found the essential elements of the charged crime beyond a reasonable doubt, viewing the trial evidence in the light most favorable to the State. State v. Brockob, 159 Wash.2d 311, 336, 150 P.3d 59 (2006). An insufficiency claim "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). We treat direct and circumstantial evidence as equally reliable and we defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980); State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533 (1992).

B. Sufficient Evidence of Accomplice to First Degree Robbery
¶ 67 Under RCW 9A.08.020(3), an individual is guilty as an accomplice if he or she "solicits, commands, encourages, or requests" another person to commit a crime or aids in its planning or commission, knowing *264 that his or her act will promote or facilitate the commission of the crime. The State must prove more than a person's physical presence at the crime scene and assent to establish accomplice liability. State v. Everybodytalksabout, 145 Wash.2d 456, 472-73, 39 P.3d 294 (2002). But "`the State need not show that the principal and accomplice share the same mental state.'" State v. Hoffman, 116 Wash.2d 51, 104, 804 P.2d 577 (1991) (internal quotation marks omitted) (quoting State v. Guloy, 104 Wash.2d 412, 431, 705 P.2d 1182 (1985)). "The word `aid' means all assistance whether given by words, acts, encouragement, support, or presence." 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 10.51, at 217 (3d ed. 2008).
¶ 68 After Banks approached the vehicle seeking to purchase marijuana, the passenger told him to follow the vehicle up the road. The passenger was already armed with the gun when Banks caught up with the vehicle and approached to buy drugs. The passenger took Banks' money and shot him repeatedly; the driver sped away. This evidence leads to reasonable inferences that Marlow, as the driver, both positioned the vehicle for a quick getaway and allowed time for the shooter to draw his gun to confront Banks. Viewing facts in the light most favorable to the State, we hold that the State presented sufficient evidence to convict Marlow as an accomplice to first degree robbery.
¶ 69 We affirm Marlow's convictions[28] but vacate McDaniel's convictions and remand for a new trial.
I concur: ARMSTRONG, J.
QUINN-BRINTNALL, J. (dissenting in part).
¶ 70 I concur with the majority that Direce Christopher Marlow's conviction should be affirmed. I write separately to respectfully dissent from the majority's holding that Detective Gene Miller's testimony recounting Maurice M. McDaniel's and Marlow's true names requires reversal of McDaniel's conviction. In my opinion the majority's confrontation clause analysis regarding Miller's trial testimony is unnecessary because the testimony was admissible to explain why he placed photographs of Marlow and McDaniel in the montage and because there is no showing that Miller repeated any out-of-court hearsay statements to the jury. Moreover, in light of Cashundo Banks's unequivocal identification that McDaniel and Marlow were the two men who shot him and left him to die in the street, any error in admitting Miller's testimony regarding the perpetrators' true names was unquestionably harmless. Because I would affirm both Marlow's and McDaniel's convictions, I respectfully dissent.
¶ 71 In a telephone conversation recorded with notice by the Pierce County jail, "Tony Guns" and "Reese" bragged to inmate Verrick Yarbrough about a shooting at 45th Street in Tacoma. While investigating a homicide involving Yarbrough, Detective Miller listened to 70 hours of recorded telephone conversations that Yarbrough made from the jail. Miller's subsequent investigation revealed that on July 29, 2006, Banks had been shot at 45th Street in Tacoma. Miller continued investigating the Banks shooting and learned that "Tony Guns's" true name was McDaniel, while "Reese" was Marlow's moniker. Miller used this information to create two photomontages  one containing McDaniel's photo and the other containing Marlow's. Using these montages, eight months after the shooting, Banks unequivocally identified McDaniel as the man who shot him and Marlow as the driver of the car.
¶ 72 At trial, McDaniel and Marlow moved in limine to exclude Detective Miller's testimony regarding their true names. Although I agree with the majority that Miller lacked personal knowledge, his testimony about the defendants' names was based on his entire investigation  not just statements of other gang members  and was admissible to explain how he came to include McDaniel's and *265 Marlow's photos in the photomontages.[29] Because Miller's testimony was otherwise admissible for purposes of explaining the composition of the photomontages, it was not a prejudicial error when the jury heard it in connection with the recordings of the telephone conversation. See, e.g., United States v. Cawley, 630 F.2d 1345, 1349-50 (9th Cir. 1980) (listing cases in which agents were allowed to testify to statements by informants because those statements were not offered to prove the truth of the matter asserted but rather to explain why law enforcement officers conducted the investigation); State v. Iverson, 126 Wash.App. 329, 336-37, 108 P.3d 799 (2005) (holding that evidence of woman's self-identification was not hearsay and was admissible for the limited purpose of explaining the officers' subsequent investigation). When evidence is improperly admitted for one purpose but could have been properly admitted for another, the error is harmless. See State v. Foxhoven, 161 Wash.2d 168, 179, 163 P.3d 786 (2007) (admission of evidence under ER 404(b) exception is harmless when the evidence is properly admitted under a different exception).
¶ 73 In addition, unlike most statements challenged under Crawford,[30] all names (except perhaps those who are self-named, such as the identifier of the artist formerly known as Prince) are technically hearsay, as is the learning and stating of them. Evidence rules do not require exclusion of someone's name or personal family history. "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). And ER 804(b)(4)(i) expressly provides that statements concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, marriage, ancestry, or other similar facts concerning personal or family history are admissible even if the declarant is unavailable to testify and had no means of acquiring personal knowledge of the matter stated. This same information can also be testified to by a declarant who is related to the other by blood, adoption, marriage, or is so intimately associated with the other's family that the declarant is likely to have accurate information concerning the declared matter, which in this case was a true name. See ER 804(b)(4)(ii). At the pretrial hearing, Detective Miller testified that, in addition to other information revealed during the course of his investigation, he learned "Tony Guns's" and "Reese's" true names from persons "immediately associated" with the McDaniel and Marlow families. See ER 804(b)(4)(ii).
¶ 74 During the pretrial hearing, Detective Miller testified that G.H., a witness in the Yarbrough case, told Miller that there was evidence of witness tampering in jail recordings of telephone conversations between Yarbrough, Reese, and Tony Guns. In an earlier search of Marlow's residence, conducted via search warrant issued in the Yarbrough case, police seized gang paraphernalia including a photograph of Yarbrough and Marlow. Writing on the photo identified Yarbrough as "V-Real" and Marlow as "Reese."
¶ 75 At the pretrial hearing, Detective Miller testified that gang members associated with both Marlow and McDaniel identified McDaniel as "Tony Guns." Although Miller testified at trial that "Tony Guns's" true name was McDaniel, McDaniel did not cross-examine Miller regarding his basis of knowledge for this identification.
¶ 76 Importantly, the recorded telephone conversations provided Detective Miller information *266 independent of the other gang members' statements that corroborated Miller's identification of McDaniel as "Tony Guns." For example, in one phone conversation, Yarbrough and Marlow talk about how "Tony Guns" got kicked out of his grandmother's place for getting caught with a weapon. Miller knew that around the same time as the recorded conversation, McDaniel had been kicked out of his grandmother's home and had to move in with his mother. In another unrelated police contact, McDaniel impersonated Marlow's brother Marvin.
¶ 77 Detective Miller described his investigation as follows:
[Miller:] Well, after hearing this conversation, or this series of conversations, it was clear that it was a shooting. It was clear that it was some type of drug deal gone sideways. I believe that it occurred on 45th Street. The victim had a bicycle, and so all I did was query our data base for any shootings that took place along the 45th Street corridor. I think I went back a period of 30 days, and as it turned out, there was only one, and that one happened to be this case where the victim was on a bicycle. It was a dope deal gone sideways. The victim was shot, and it did occur on 45th Street.
1 Report of Proceedings (RP) at 67.
[Miller:] I didn't initially get called out to the scene. This case was actually assigned to another detective initially, and it was only through my investigation of [Yarbrough for] the Sims homicide that we developed suspects, and then at that point I took over the investigation and worked it.
1 RP at 69.
[McDaniel's Defense Attorney:] And so essentially, well, let me ask you, how many people have actually identified Mr. McDaniel as being Tony Guns, and who are these individuals?
[Miller:] Well, like I said before, I remember specifically [G.H., D.W.]. I remember [M.T.] identifying Direce. I don't remember for certain if she said Maurice. [K.C.].[31] Those are the ones that I can specifically remember, although I remember there being others. I don't remember specifically who.
1 RP at 72.
[Prosecutor:] I want to make clear, all the phone calls that are referred to by the transcript, as well as predominantly those involving Mr. Marlow and Mr. McDaniel, go into the Marlow residence. They are from the jail to the Marlow residence?
[Miller:] Yes. At the time, all I knew was that the phone number provided to me by [G.H.] saying that's where the numbers were. He believed that it was three-way calls and it was coming from that number. The subsequent check revealed that that phone number did belong to the residence there on 34th Street.
1 RP at 79.
[Miller:] There is a number of phone conversations where an individual identified himself as Tony Guns, Maurice McDaniel is telling Verrick about how they got stopped, him, [T.S.], Direce, and I think [W.T.], who goes by the street name of [T* * *], were all stopped. And Maurice claimed to be Marvin, but he spelled his name wrong, M-A-R-V-O-N, and that type of a thing. And this was  they were saying that that incident took place the day before, and that the officer had, I think it was [Marlow's mother] that they talked to, in order to cancel the runaway report that Marvin had, and they were joking about all of that.
There was, in fact, a runaway report on Marvin Marlow, and that report, or the runaway was canceled on August 14th, which would have been the day before this phone conversation. And that was when the vehicle was stopped by officers by the Tacoma Police Department.
[Prosecutor:] Okay. So any reference to Marvin is actually 
[Miller:] It was Tony Guns because he was claiming [in the telephone conversation] *267 to [be] Marvin, for whatever reason. They found some marijuana in the car, and I don't remember what else was there, but he, based on the phone transcripts, or the phone conversation, was providing that name in order to avoid apprehension, or detention, or identification.
[Prosecutor:] And you verified that those incidents actually occurred?
[Miller:] Yes.
[Prosecutor:] Okay. Now, meaning the police reports and etcetera you verified that?
[Miller:] Yes.
[Prosecutor:] You were asked, I believe by the Court, at least at one point, how did you know, did somebody say their name was Guns, or refer to Guns or Tony Guns, and can you give the Court just an accurate idea of how often the individual on the phone, Mr. Yarbrough, would say, let me speak to, you know, Tony Guns, or let me speak to Reese, those kind of things? We have at least one reference on the transcript.
[Miller:] There was several. I mean, well over a dozen times where it was those type of things, and several other instances where Verrick [Yarbrough] would refer to the person that he was talking to as Guns.
....
[Prosecutor:] I just want to give one example of the people that are telling you independently who Tony Guns is, specifically. [K.C.]. Just explain to the Court the circumstances under which you asked [K.C.] if he knows Mr. McDaniel?
[Miller:] [K.C.] is currently in custody on an unrelated gang homicide. During the course of the conversation I had with him, with his defense counsel present, because I had knowledge that he had been arrested with Maurice McDaniel before, I asked [K.C.] if he knew Maurice's street name, or gang name, and he said Tony Guns.
1 RP at 83-86.
¶ 78 After Detective Miller detailed his investigation leading to "Reese's" and "Tony Guns's" true names, the trial court denied the defense motion in limine.
¶ 79 Except for statements naming and identifying someone as the perpetrator of a crime, which K.C. did not do, it is difficult to see how identifying a person's name is "testimonial" evidence. Because all names are technically hearsay, under the majority's analysis admitting evidence of a person's true name could never be proved and evidence of a person's name would always violate Crawford. The trial court did not err in allowing Detective Miller to testify, in effect, that the totality of his investigation led him to conclude that "Tony Guns's" true name was McDaniel. McDaniel challenges the following testimony, asserting that it violated his confrontation clause rights:
[Prosecutor:] And when you were listening to [the tape] conversations, those that were discussing this shooting, did they identify themselves?
[Miller:] I am not sure.
[Prosecutor:] By any means did they identify when they were speaking who spoke to Mr. Yarbrough; is that correct? [sic]
[Miller:] Correct.
[Prosecutor:] Did they identify themselves by any type of name?
[Miller:] They were identified, yes.
[Prosecutor:] Okay. And how many speakers were there that were discussing this shooting?
[Miller:] A total of three.
[Prosecutor:] And have you heard the name Tony Guns?
[Miller:] Yes.
[Prosecutor:] And where have you heard that name?
[Miller:] On that jail phone recordings. [sic]
[Prosecutor:] Is that one of three talkers, I guess, that was discussing the shooting on 45th?
[Miller:] Yes.
[Prosecutor:] Do you know anybody that uses the name Tony Guns?
[Miller:] Yes.
[Prosecutor:] Who?

*268 [Miller:] Maurice McDaniel.
[Prosecutor:] And do you know Maurice McDaniel by sight?
[Miller:] Yes, I do.
[Prosecutor:] Would you point him out for the record, please.
[Miller:] The young man at the end of the table wearing the blue and white checkered shirt.
[Prosecutor:] For the record, the witness has identified the Defendant, Maurice McDaniel.
....
[Prosecutor:] Do you know anybody else other than Maurice McDaniel that goes by the name of Tony Guns?
[Miller:] No.
5 RP at 771-73.
¶ 80 I note that the defense could have but did not cross-examine Detective Miller regarding his basis of knowledge for this testimony. Miller's testimony was based on the totality of his investigation, not just the identifying statements of McDaniel's fellow gang members. Moreover, no out-of-court statements of identity, other than Banks's identification from the photomontage, were before the jury. Accordingly, Miller's trial testimony did not violate McDaniel's confrontation rights.
¶ 81 Assuming the trial court erred in the manner of admitting Miller's testimony of the defendants' true names, the error was unquestionably harmless. Evidence improperly admitted in violation of the confrontation clause is subject to a constitutional harmless error test. Lilly v. Virginia, 527 U.S. 116, 139-40, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); State v. Koslowski, 166 Wash.2d 409, 431, 209 P.3d 479 (2009). "If the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt, the error is harmless."[32]Koslowski, 166 Wash.2d at 431, 209 P.3d 479.
¶ 82 The evidence presented to the jury in this case conclusively established that Banks immediately and unequivocally identified McDaniel and Marlow as his assailants from the photomontages Detective Miller created after completing the investigation detailed in the pretrial hearing set out above. Miller testified to Banks's identification as follows:
[Prosecutor:] I would like you to read to the jury the admonition that you read to Mr. Banks.
[Miller:] You are about to view a group of photographs for the purpose of identifying a suspect in a crime. The fact that the photographs are shown to you should not influence your judgment. This group of photographs may or may not include a photograph of a person who committed this crime. Therefore, you should not conclude or guess.
You are not obligated to identify anyone. Keep in mind that a photograph may or may not depict the current appearance of a person who committed the crime, since people can change their appearance in numerous ways.
Also, photographs do not always show the true complexion of a person who could be lighter or darker than shown.

*269 Finally, please do not discuss this case with any other witnesses, nor indicate in anyway that you have or have not identified anyone. And then the next section down there, it says, I have fully read and understand the above statement. And I basically ask them that question, rather than having them read it themselves, and if they don't have any questions, then if they don't have any questions, they will sign it. And if they have any questions they won't sign it until those questions are resolved.
[Prosecutor:] And you said Mr. Banks didn't have questions. Did he sign the form?
[Miller:] Yes, he did.
[Prosecutor:] And is it dated?
[Miller:] It's dated April 10th of '07.
[Prosecutor:] Which admonition and series of photographs did you show Mr. Banks first?
[Miller:] I showed him the montage including Direce Marlow first.
[Prosecutor:] Okay. When you showed it to him, what happened? And let me ask to be clear, you didn't do both admonitions and then show him the montages. You did one at a time; is that accurate?
[Miller:] Yes. Whenever I am showing multiple montages, I always like to have a break in between, kind of like to let them clear their brain, kind of a thing.
[Prosecutor:] So the first one that you did was Mr. Marlow?
[Miller:] Yes, I am just going to confirm that but  yes, it was the one involving Mr. Marlow.
[Prosecutor:] And what happened when you showed him the photographs?
[Miller:] Well, like I said 
[Marlow's Defense Counsel]: Objection, Your Honor, calls for hearsay.
The Court: Overruled.[33]
[Miller:] Well, like I said, I read the admonition that is up at the top that I just read for the jury, and then I provide them with the actual photomontage. And at that point, all I do is basically sit back and watch them, watch their eyes and wait for some type of a response....
....
[Prosecutor:] [W]hat was [Banks's] reaction? What happened?
[Miller:] He viewed the montage, scanning all the pictures. He returned his eyes to the photograph of Mr. Marlow and put his finger on Mr. Marlow's photo and said wow, man, this is wild. He was the driver. That guy was the driver.
[Prosecutor:] What was his emotional state when he was saying that?
[Miller:] He was upset. He got emotional in seeing the photo and recognizing the photo.
[Prosecutor:] Can you give the jury any sort of description of what you mean by he got upset and emotional, and specifically tone of voice, any mannerisms, or anything that would be more of a description of what you are seeing?
....
[Miller:] Began to tear up, kind of choking back tears, kind of shook his head a little bit, as he was making those statements, and then following those statements.
[Prosecutor:] You said initially he scanned all of those photos with his eyes, and then his eyes went to Mr. Marlow and he put his finger on it. How long a process was that before he put his finger and says the words that you have indicated that he said?
[Miller:] 20, 30 seconds.
....
[Miller:] He actually signed it, indicating that he selected a particular photograph, and then there is a narrative below that he wrote.
....
[Prosecutor:] Okay. Now, after that, what happened?
[Miller:] I waited for a couple of minutes. We talked. I don't even remember what *270 about. It had nothing to do with this case, just to let him clear his mind and relax for a couple of minutes, because he was upset. And then I went through the exact same process with him a second time, again, reading the top of the admonition form, having him sign it. After he indicated that he had no questions, I showed him the second montage, including  it included Maurice McDaniel.
[Prosecutor:] How long a time period did you give him to relax?
[Miller:] 2 or 3 minutes.
[Prosecutor:] Did you stay in the room with him?
[Miller:] Yes.
[Prosecutor:] Did you talk to him about the case at all?
[Miller:] No, we talked about everything but the case. I just wanted him to kind of relax.
[Prosecutor:] And did his demeanor change at all during that time period from what you described when he pointed out Mr. Marlow?
[Miller:] He calmed down after a minute or so.
[Prosecutor:] And was he able to follow and go along with the process, the second process, involving Mr. McDaniel?
[Miller:] Yes.
[Prosecutor:] Did he sign the form acknowledging, again, that he understood the admonition?
[Miller:] Yes.
[Prosecutor:] Did he have any questions the second time?
[Miller:] No.
[Prosecutor:] After that, did you, in fact, show him the photomontage, including a photograph of Mr. McDaniel?
[Miller:] Yes.
[Prosecutor:] And what happened?
[Miller:] Again, he was shown the montage after being advised of the admonition. And at that point, when he looked at the montage, again, he, I mean, he just flat out started to cry. He pointed to Mr. McDaniel's photo, and his exact words were, "That's the fucker that shot me."
[Prosecutor:] Did he say anything else in regard to identifying Mr. McDaniel?
[Miller:] Well, he was pretty upset, for probably about a minute. I couldn't understand anything that he was saying. When he finally calmed down a little bit, I asked him to clarify what he was regarding, and his comment to me was, "I can't believe they just left me there to die. They just didn't care." And he, again, referred to the photograph selected as the person that shot him.
[Prosecutor:] Did you have him document on the actual photomontage the person that he picked?
[Miller:] Yes. Again, I asked him to circle and sign below the photograph that he selected.
[Prosecutor:] And did you also have him complete the lower portion of the admonition form?
[Miller:] Yes, he  I filled out what needed to be filled out. He signed it, dated it, and then he did the narrative portion on his own.
5 RP at 786-93.
¶ 83 Banks unequivocally, and without hesitation, identified McDaniel as the man who shot him and left him in the street to die and Marlow as the driver. Detective Miller and Banks testified and were available for cross examination regarding Banks's montage identification. Moreover, this evidence was not excludable hearsay. See ER 801(d)(1)(iii) (statements of identification of a person made after perceiving the person are not hearsay). Later, during the trial, Banks positively identified Marlow and McDaniel as the men who shot him and left him in the street to die. Before rendering its verdict, the jury heard Banks's testimony and the defense cross examination. As an appellate court, we defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness of evidence. State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533, review denied, 119 Wash.2d 1011, 833 P.2d 386 (1992). As an appellate court, we lack authority to substitute our judgment for that of a properly *271 instructed jury such as here. State v. O'Connell, 83 Wash.2d 797, 839, 523 P.2d 872 (1974) ("The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered."). The weight and credibility of Banks's identification testimony is not subject to review and any error in admitting Detective Miller's testimony regarding "Tony Guns's" and "Reese's" true names was unquestionably harmless. See State v. Watt, 160 Wash.2d 626, 633, 160 P.3d 640 (2007) (Crawford errors are subject to harmless error). Accordingly, both McDaniel's and Marlow's convictions should be affirmed.
NOTES
[1] RCW 9A.28.020; RCW 9A.32.030(1)(a).
[2] RCW 9A.56.190; RCW 9A.56.200(1)(a)(i).
[3] Former RCW 9.41.010(12) (2001); former RCW 9.41.040(1)(a) (2005).
[4] U.S. Const. amend. VI.
[5] In his statement of additional grounds for review, RAP 10.10, McDaniel raises more issues that we do not address because we vacate his convictions and remand for a new trial.
[6] Banks used a false name because he had an outstanding arrest warrant and did not want to go to jail.
[7] Banks also told police of a third individual who sat in the back seat but apparently he could not provide a further description. At trial, Banks testified that he saw two men and denied reporting a third.
[8] The record does not indicate when or how police arrested Marlow.
[9] At trial, the State also introduced audio recordings of telephone calls between Yarbrough, "Reese," and "Tony Guns," as well as a transcription of the recordings.
[10] ER 702 states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
[11] ER 705 provides, "The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination."
[12] "[T]he accused shall enjoy the right to ... be confronted with the witnesses against him." U.S. Const. amend. VI.
[13] Under Washington's constitution, the accused also has "the right to ... meet the witnesses against him face to face." Wash. Const. art. I, § 22.
[14] The parties did not provide, and we could not find, any authority clarifying (1) whether a declarant's out-of-court statement that someone goes by a particular nickname or nickname constitutes testimonial hearsay or (2) the point during a police investigation at which law enforcement has personal knowledge of a fact instead of hearsay statements. Common law provides an "`exception to the hearsay rule that evidence as to the name by which a person is known, although it may not be the best evidence as to his true name, cannot be excluded on the ground that it is hearsay.'" State v. Howard, 127 Wash. App. 862, 870-71, 113 P.3d 511 (2005) (quoting State v. Siverly, 140 Wash. 58, 60, 248 P. 69 (1926)). But "after Crawford, a state's evidence rules no longer govern confrontation clause questions," and we need not reach the hearsay question. State v. Price, 158 Wash.2d 630, 639 n. 5, 146 P.3d 1183 (2006).
[15] The organized crime slang word "capo"  a captain in a Mafia family  is an example of what an expert officer might properly explain for the jury. Mejia, 545 F.3d at 189.
[16] ER 804 provides, in relevant part:

(a) Definition of Unavailability. "Unavailability as a witness" includes situations in which the declarant:
(1) Is exempted by the ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or
(2) Persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or
(3) Testifies to a lack of memory of the subject matter of the declarant's statement; or
(4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
(5) Is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subsection (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.
(6) A declarant is not unavailable as a witness if the exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
....
(4) Statement of Personal or Family History. (i) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history, even though declarant had no means of acquiring personal knowledge of the matter stated; or (ii) a statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared.
[17] Because we also hold that evidence of McDaniel's purported flight was error, we do not consider such evidence to be untainted for purposes of this harmless error analysis.
[18] "`The purpose of a motion in limine is to dispose of legal matters so counsel will not be forced to make comments in the presence of the jury which might prejudice his presentation.'" State v. Kelly, 102 Wash.2d 188, 193, 685 P.2d 564 (1984) (quoting State v. Evans, 96 Wash.2d 119, 123-24, 634 P.2d 845 (1981)). Therefore, "[u]nless the trial court indicates further objections are required when making its ruling, its decision is final, and the party losing the motion in limine has a standing objection." Kelly, 102 Wash.2d at 193, 685 P.2d 564. Here, we review the issue because counsel appeared to have a standing objection.
[19] ER 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
[20] The parties failed to cite and we cannot find any Washington cases involving the admission of flight evidence involving a vehicle's passenger. But in State v. Salazar, 112 Ariz. 355, 356, 541 P.2d 1157 (1975), the Arizona Supreme Court concluded that "[t]he fact that the defendant is present as a passenger in the vehicle involved in the flight is not sufficient in and of itself to support the giving of an instruction on the ramifications of flight." It explained why such a jury instruction was improper: "If [the defendant] had been the driver of the vehicle the resultant police chase would support an instruction on flight. However, to impute the actions of the driver to a passenger without evidence to show that he encouraged the flight would be creating a presumption which is controverted by the evidence." Salazar, 112 Ariz. at 357, 541 P.2d 1157.
[21] Even if we were to consider the merits of McDaniel's challenge to instruction 12, the trial court's premeditation instruction was identical to 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 26.01.01, at 360 (3d ed. 2008) (WPIC). In cases involving virtually identical challenges to WPIC 26.01.01, the Washington Supreme Court has repeatedly held that this model instruction adequately states the law on premeditation and characterized such challenges as frivolous. See, e.g., State v. Clark, 143 Wash.2d 731, 770-71, 24 P.3d 1006 (2001); In re Pers. Restraint of Lord, 123 Wash.2d 296, 317, 868 P.2d 835, clarified on other issues, 123 Wash.2d 737, 870 P.2d 964 (1994).

McDaniel also argues that the purported flaws in these instructions constituted manifest constitutional errors under RAP 2.5(a)(3). But his RAP 2.5(a)(3) argument merely repeats the above frivolous claim and we do not consider it.
[22] In addition, Marlow and McDaniel fault the trial court's initial comments addressing the severance question, arguing that its requirement that counsel provide written briefing or controlling authority before considering severance "constituted an abuse of discretion because it amounted to a refusal to exercise discretion." Br. of Appellant (Marlow) at 8. But the trial court nevertheless addressed whether severance was appropriate without written briefing.
[23] ER 609(d) states, in part, "Evidence of juvenile adjudications is generally not admissible under this rule."
[24] We note, however, that the defendants likely would not have been barred from demanding a subsequent jury trial on the firearm charges should they have chosen to contest a bench trial on severed counts. See U.S. Const. amend. VI.
[25] As far as we can find, the only explicit mention of the word "gang" before the jury involved an officer's brief answer to the question, "[H]ow long ... does it normally take to drive from 45th all the way down to 43rd, down that alleyway?" RP (Dec. 3, 2007) at 685. The officer responded:

Usually when I am driving  we have a large gang problem in this area, sir, so usually when I am driving through this area, it's slow. I have the lights on. I am looking for any type of gang activity, or people that I need to stop and identify and make contact with. So I am never driving very fast.
RP (Dec. 3, 2007) at 685.
[26] Marlow's counsel noted that he "looked at case law, and ... couldn't find references where specifically juvenile offenses were dealt with [] regard to firearms.... So I didn't find anything terrifically on point." RP (Nov. 28, 2007) at 189. This suggests that counsel made a tactical decision to forgo written briefing in lieu of oral argument.
[27] We recognize that this contention suggests that McDaniel was the passenger in Marlow's vehicle who shot Banks but this argument was not made before the jury.
[28] RCW 9A.08.020(6) permits reversal of the principal's conviction without reversing the codefendant accomplice's conviction. See State v. Bobenhouse, 143 Wash.App. 315, 322-24, 177 P.3d 209 (2008), aff'd, 166 Wash.2d 881, 214 P.3d 907 (2009).
[29] Detective Miller testified at the pretrial hearing regarding exclusion of testimony about "Tony Guns's" and "Reese's" true names. He testified that he could not positively identify that the voices on the recordings were McDaniel and Marlow. I note that a trial court may require or allow defendants to produce voice exemplars. See United States v. Dionisio, 410 U.S. 1, 7, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (holding that suspects could be compelled to read a transcript in order to provide a voice exemplar, explaining that the "voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said"); State v. Collins, 152 Wash.App. 429, 440, 216 P.3d 463 (2009) (holding that a trial court may compel a defendant to provide a voice exemplar without offending the Fourth Amendment to the United States Constitution).
[30] Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[31] The names of these individuals appear in the record.
[32] The United States Supreme Court developed a different test to determine whether violations of the confrontation clause are harmless. In Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Court said,

The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.
Division One recently employed this test in State v. Saunders, 132 Wash.App. 592, 604, 132 P.3d 743 (2006), review denied, 159 Wash.2d 1017, 157 P.3d 403 (2007), and the Washington Practice series notes some uncertainty regarding which rule Washington courts use for confrontation clause violations. 5 Karl B. Tegland, Washington Practice: Evidence Law and Practice § 103.25, at 110 (5th ed. 2007). Our Supreme Court's 2009 decision in Koslowski, 166 Wash.2d 409, 209 P.3d 479, used the "overwhelming evidence" test without mentioning the Van Arsdall factors, and I apply that test here.
[33] "A statement is not hearsay if  (1) ... [t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is ... (iii) one of identification of a person made after perceiving the person." ER 801(d).