# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71095-8-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| MICHAEL ANTHONY WADE | ) | |
| | ) | FILED: June 29, 2015 |
| Appellant. | ) | |
| | ) | |

APPELWICK, J. — Michael Wade appeals 12 convictions in a bench trial arising from three residential burglaries. The admission of a co-participant's out-of-court statement, as a statement of identification under ER 801(d)(1)(iii), implicating him in the crimes was not error. Sufficient evidence supports the convictions. Any error in failing to treat six counts of theft of a firearm as the same criminal conduct was waived by failing to object. We affirm.

## FACTS

On a Tuesday afternoon, October 9, 2012, three homes in Seattle area suburban neighborhoods were burglarized within a three-hour time-span. The first burglary took place at the Kirkland home of Paul Wu. Wu's neighbor, Hana Trnka, was unloading groceries from her car at around noon, when she noticed a grayish sedan parked near her house in front of an empty lot. Trnka approached the car and asked the driver if he was lost or needed assistance. The sole occupant sitting in the driver's seat was a bald-headed thin man who appeared to be of Middle Eastern descent. The man was talking on a cell phone. He told Trnka he did not need help, but explained that he parked to avoid talking while driving.

Wu's wife returned home after lunch and discovered the break-inThe burglars had entered the home by shattering a sliding glass door at the back deck. The stolen items included laptop computers, a tablet, jewelry, a Pentax camera, handbags, and coins.

The second burglary occurred at a Kenmore home belonging to Binh Vu. The Vus returned home at approximately 2:00 p.m. and discovered their home had been ransacked and burglarized. The burglars again entered the home by breaking a glass door at the back of the house. The items taken from the home included numerous bottles of liquor, gold jewelry, and a tablet Vu recently purchased.

The third burglary occurred at the Kirkland home of Carl Reek. That afternoon, Reek's neighbor, Vanessa Simpson, walked her dog past the Reeks' house and noticed a golden brown sedan parked in front. A thin man with brown skin was sitting in the driver's seat and leaned back in his seat as Simpson passed. When Simpson passed the Reeks' home a second time about 10 minutes later, the car was gone and Reek's wife was standing at the front door.

It was shortly after 2:00 p.m. when Reek's wife returned home, thought she heard people inside the house, and then saw that the front door had been kicked in. Several upstairs rooms were visibly disturbed and plastic shopping bags normally stored in the bathroom were strewn around. Reek reported numerous missing items including six firearms, approximately $1,400 in cash, jewelry, laptops, a tablet, a Kodak camera, and a package of .38 caliber ammunition.

About a month before the burglaries, Reek answered a knock at the door and observed a thin African-American man on the doorstep. It was not clear what the man wanted. He backed off the porch when Reek opened the door and said something unintelligible about an "opportunity." Then, exactly two weeks before the burglaries, Reek answered another knock at the door and a different, larger African-American man was at the door. Reek communicated that he was occupied on the telephone and the man left. Also, in the weeks before the burglary, Reek noticed a brownish gold Toyota Camry parked in different places in the neighborhood.

A few days before the burglaries, a caller reported seeing a gold Camry parked in several different locations in an Eastside residential neighborhood. The caller provided a license plate number and said that at one point, the occupants got out of the car and walked around a house. A police officer went to investigate and saw the car as it passed him travelling in the opposite direction. There were at least three African-American males in the car. The officer was unable to catch up with the car.

On the date of the burglaries, Bellevue Police Detective Jeffrey Christiansen received the information about the gold Camry from a few days before, and without knowing the burglaries had just occurred, decided to investigate. Christiansen learned that the Camry was registered to Carol Anderson and associated with her grandson, Michael Wade. Christiansen and a surveillance team arrived at Anderson's home in South Seattle at approximately 3:30 p.m.

About 30 minutes later, the gold Camry arrived. There were four people in the car. Wade was driving the Camry and a person later identified as Filmon Berhe was in the front passenger's seat. After Wade parked, he went around to the back of the car and opened the trunk. One of the back seat passengers, later identified as Wade's brother Cody Wade, got out of the car and stood next to Wade. Wade appeared to be manipulating items in the trunk while Cody visually scanned the area.[1] About a minute later, as a parking enforcement vehicle drove by, Cody tugged at the back of Wade's shirt and Wade closed the lid of the trunk. [Id. at 78-79] Wade then reopened the trunk, Cody took a white plastic shopping bag and walked across the street with it and out of the detectives' view. The bag appeared to be weighed down by heavy objects.

Wade, Berhe, and the fourth person, later identified as Christopher Patterson, went toward Anderson's house. A few minutes later, all four returned to the car, Wade drove away from the house, and the officers followed. Eventually, the car stopped at a strip mall and Cody and Patterson got out of the car and carried a small bag into a jewelry store. Wade parked across the street.

At that point, Detective Christiansen was able to definitely confirm that Wade was the driver and decided to arrest him on an outstanding warrant. During the process of that arrest, police officers learned of another warrant for Berhe's arrest and arrested him at the same time. From outside the Camry,

---

[1] Because Cody and Michael Wade share the same last name, we refer to Cody Wade by his first name for clarity.

4

Detective Christiansen could see several cloth gloves and a partially obscured tablet inside the car.

While some officers arrested Wade and Berhe, other officers briefly detained Cody and Patterson. After the officers released Cody and Wade, the jewelry store owner confirmed that they had sold some jewelry and later, one of the homeowners confirmed that some of the jewelry belonged to him.

The police searched the Camry and found a substantial amount of property stolen from all three homes including tablets, computers belonging to Wu and Reek, Wu's Camera, and bottles of alcohol. The Camry also contained an extra-large jacket with glass shards in the pockets and several cell phones. However, the firearms taken from the Reek residence were not in the Camry. Seattle police officers eventually found one of the firearms missing from the Reek residence in a stolen car.

Two days after arresting Wade and Berhe, police officers arrested Cody and Patterson. Patterson admitted that he committed the burglaries with Wade, Berhe, and Cody. Patterson specifically confirmed that the stolen property included firearms and said that Wade was the person who primarily handled the guns.

Within an hour of his arrest, Wade began making desperate telephone calls from the jail, telling Cody that if he ever wanted to see him and Berhe "alive" again, he must "immediately" get rid of the "dunt-dunt-da-dunt-dunt-dalas" that were located in "Barney the dinosaur" Wade stressed the urgency of this, repeatedly stating that the "dunt-dunt-da-dahs" must be "[o]ut of Barney" and

5

that "Barney" had to be absolutely "clean and sober." Wade talked at length about the numerous potential firearms charges and sought assurance that the State would not be able to pursue those charges without finding the stolen firearms.

Police searched Anderson's home and a purple GMC Yukon vehicle associated with Cody parked across the street from Anderson's home, but found no evidence inside the home or the vehicle related to the burglaries. However, when the Yukon was towed, police found a white plastic shopping bag underneath the vehicle containing ammunition.

The State charged Wade, Berhe, Patterson, and Cody with three counts of residential burglary and two counts of theft of a firearm. The State later amended the information and charged each defendant with a total of 12 counts: three counts of residential burglary, six counts of theft of a firearm, one count of trafficking in stolen property, one count of theft in the second degree, and one count of unlawful possession of a firearm. [2] Berhe, Patterson, and Cody each entered guilty pleas and were sentenced prior to trial.[3] Wade waived his right to a jury and proceeded to a bench trial.

---

[2] The court granted the State's motion to amend the information again just before trial to correct a scrivener's error with respect to the monetary amount required for theft in the second degree.

[3] Patterson pleaded guilty to three counts of residential burglary, one count of unlawful possession of a firearm, and one count of theft of a firearm. According to the State's sentencing memorandum, the State made the same plea offer to Wade before trial and offered to recommend a low-end sentence of 164 months. After the State rested, the State made a second offer to dismiss four of the six theft of a firearm counts, which would have reduced the bottom of the range from 549 months to 241 months. The record does not include any information about the sentences of the other participants, but Wade indicates in his briefing that the

6

The State presented evidence of cell phone activity indicating that Wade, Berhe, and Cody were in cell phone contact with each other and were "in proximity to each house at the time of the burglaries." For instance, there was a 25 minute call between Berhe and Cody near the Wu home that started at approximately 11:45 am, encompassing the time that Trnka reported speaking to someone matching Berhe's description, who was talking on a cell phone.

Patterson reluctantly testified under a grant of immunity. Contrary to his statement at the time of his arrest, Patterson testified that he burglarized two houses by himself on October 9. He denied stealing any firearms. Patterson said that Cody and Berhe picked him up after the burglaries and he sold some stolen laptops while driving around with them. Patterson testified that Wade later joined the group, they switched cars to the Camry, and he put another stolen item, an iPad, in the trunk of the Camry and planned to sell it. Patterson claimed that the jewelry he sold belonged to his girlfriend.

Patterson testified that he never implicated the others or admitted to taking firearms. Patterson acknowledged that he signed a statement containing false information, but explained that the police forced him to sign and said they would help him. The State read some portions of Patterson's statement and asked whether or not those specific statements were true, including Patterson's statement that he "was with Mike and Cody Wade and Phil" on October 9, 2012

---

sentences of Berhe, Cody, and Patterson were 124 months, 89 months, and 84 months, respectively.

and his statement that Wade brought the guns into the house and that the six guns were together in one plastic shopping bag.

Detective Christiansen described Patterson's arrest and recounted Patterson's postarrest statements that he committed the burglaries with Wade, Cody and Berhe and his statement that Wade was the person who handled the firearms after the burglaries.

Investigators did not find any fingerprint print evidence at the burglary scenes, suggesting that the suspects wore gloves. Police showed the Wus' neighbor, Trnka, a photo montage and she identified Berhe immediately as the man parked on the Wus' street at the time of the burglary.

The court entered findings of fact and conclusions of law and found Wade guilty of all twelve charges. At sentencing, the State conceded that theft in the second degree involving the property stolen from the Vu residence, amounted to the same criminal conduct as residential burglary of the Vu residence. The court did not include the theft conviction in the offender score calculation and did not impose a sentence on that count. Due to the operation of RCW 9.94A.589 (1)(c), which requires consecutive terms for the theft of firearm and unlawful possession of a firearm convictions, Wade's standard range was between 549 and 728 months. The court imposed 549 months. Wade appeals.

DISCUSSION

I.    Statement of Identification Under ER 801(d)(1)(iii)

Wade challenges the trial court's determination that Patterson's statement implicating him in the October 2012 crimes was admissible as substantive

evidence. He contends that statements of identification under ER 801(d)(1)(iii) do not encompass incriminating postarrest statements made by a former codefendant.

It was apparent before Patterson testified that he would not testify in accordance with his initial statement to the police. The court rejected Wade's argument that the State should not be able to call Patterson as a witness merely to impeach him. See State v. Lavaris, 106 Wn.2d 340, 344-45, 721 P.2d 515 (1986) (party may not call a witness for the primary purpose of impeachment with otherwise inadmissible evidence). Nevertheless, the trial court expressed concern as to whether Patterson's statement naming Wade as "the person I did the crime with" was truly a statement of identification within the meaning of ER 801(d)(1)(iii) and therefore admissible as substantive evidence. After considering briefing and argument, the court determined that Patterson's prior statement was admissible as substantive evidence based on this court's decision in State v. Grover, 55 Wn. App. 252, 256-57, 777 P.2d 22 (1989).

We review the trial court's interpretation of the rules of evidence de novo and its application of the rules to particular facts for abuse of discretion. State v. Sanchez–Guillen, 135 Wn. App. 636, 642, 145 P.3d 406 (2006). "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Unless an exception or exclusion applies, hearsay is inadmissible. ER 802. Under ER 801(d)(1), a statement is not hearsay if, "[t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the

statement and the statement is . . . (iii) one of identification of a person made after perceiving the person."

As the trial court observed, ER 801(d)(1)(iii) most commonly applies to admit a prior statement of identification after seeing the defendant's photograph or seeing the defendant in a line-up. See e.g. State v. McDaniel, 155 Wn. App. 829, 837-38, 877, 230 P.3d 245 (2010) (photomontage identification); [RP 7/17 at 13]. However, nothing in the language of the rule limits its scope to prior statements of visual identification.

As in Grover, this case involves a declarant who identified the defendant by name after visually perceiving him. 55 Wn. App. at 254. Grover involved a home invasion robbery. Id. Hughes was at home and her friend Price was out, when Price's step-children, Gardner and Parker, stopped by the house. Id. Two other men arrived shortly after and asked for Price's step-son, Parker. Id. Upon entering the house, one of the men pulled Hughes into a separate room, attacked her with a hatchet, threatened her, and demanded money. Id. When Price returned, the other man threatened him with a knife and demanded money. Parker told Hughes and Price to give the men their money. Id. Curiously, neither of the men robbed or attacked Parker or Gardner. Id. After the men left with money and property and the police arrived, Gardner gave a statement to the police. Id. She identified both assailants by name and said that Parker left to pursue them. When the police found Parker a short distance from the scene, the two individuals Gardner named and who also matched Hughes's descriptions were with him. Id. at 254-55.

10

After she was arrested on a material witness warrant, Gardner testified under a grant of immunity. Id. at 255. She said she could not remember the robbery, was intoxicated at the time, and only vaguely remembered giving a statement to the police. Id. She denied receiving any threats, but admitted her reluctance to testify. Id. One police officer testified that Gardener was not intoxicated at the time of the interview, and under ER 801(d)(1)(iii), the court permitted another officer to testify that Gardner identified Grover as one of the robbers. Id.

Grover appealed his robbery conviction. Id. This court rejected his argument that ER 801(d)(1)(iii) included only "statements of identification made by a witness during a lineup or upon viewing a photographic montage." Id. at 256. We concluded there was no basis to limit the rule to include visual, but exclude verbal, identifications. Id. at 257. In so holding, we noted that Oregon's comparable evidence rule includes official commentary stating that its rule is not "aimed at situations where, after an event, the declarant simply makes a statement which identifies the person involved ('X did it')." Id. at 257 n.7. There is no similar commentary limiting Washington's rule. While Wade suggests that the result in Grover is inconsistent with the rule's purpose, he cites no authority that undermines our determination in Grover that Washington's rule encompasses verbal identifications.

Wade argues that the hearsay exception under ER 801(d)(1)(iii) does not apply if the declarant is a coparticipant in the crime, because unlike a civilian witness, a potential codefendant has "enormous incentive" to falsely implicate

others. Nothing in Grover suggests such a limitation. In fact, the dynamics of this case are strikingly similar to those in Grover. The facts of Grover defeat Wade's argument. The circumstances clearly suggested Gardner's possible involvement in the crime when police initially questioned her. See Grover, 55 Wn. App. at 254. Gardner recanted her earlier identification. Id. at 255. Although she denied being threatened, it is reasonable to infer that she did so out of fear of retaliation. Id. Here, Patterson recanted his earlier statement to police, admitting he was involved and implicating the others. His testimony that he was labeled a "snitch" which put his life in "jeopardy" likewise supports the inference that he changed his story at trial out of fear.

For a declarant's statement to be admissible under ER 801(d)(1)(iii), the declarant must be available for cross-examination. Patterson, like Gardner, was available for cross-examination. Wade offers reasons to credit Patterson's trial testimony over his initial statement but there are equally compelling reasons to reach the opposite conclusion. Nothing in ER 801(d)(iii) or in the cases interpreting the rule suggests that a prior statement of identification is not admissible because it creates a conflict that the trier of fact must resolve. Wade had the opportunity to fully explore Patterson's motivations and the circumstances of his initial statement. In sum, the court did not err in admitting Patterson's statement as substantive evidence under ER 801(d)(1)(iii).

Even if the statement that Wade was with Patterson on October 9, 2012 falls within the scope of ER 801(d)(1)(iii), Wade contends the rule does not apply to Patterson's additional statements that described the nature of his involvement

in the crimes. But, in fact, the trial court decided the admissibility of only Patterson's statement that he was with Wade and the others under ER 801(d)(1)(iii). The record indicates that the court considered Patterson's additional statements only for purposes of impeachment.

II. Sufficiency of the Evidence

Wade contends that, without considering Patterson's statement that he was the person who handled the firearms as substantive evidence, there is insufficient competent evidence to establish that he committed any of the charged crimes, apart from trafficking in stolen property. He thus challenges the sufficiency of the evidence supporting his convictions for residential burglary, theft of a firearm, unlawful possession of a firearm, and second degree theft.

According to Wade, the stolen property in the Camry and his connection to that car and the other codefendants was the only evidence connecting him to the crimes. Wade argues that the recorded jail telephone calls may reveal a general consciousness of guilt, but do not establish his participation in the burglaries or in the crimes involving firearms.

To satisfy due process, the State must prove every element of a charged crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). When reviewing a challenge to the sufficiency of the evidence, this court considers the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt. State v. Williams, 137 Wn. App. 736, 743, 154 P.3d 322 (2007). The court draws all reasonable inferences from

the evidence in the State's favor and interprets the evidence "most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The reviewing court considers both circumstantial and direct evidence as equally reliable and defers to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

To prove that Wade committed residential burglary, the State had to establish beyond a reasonable doubt that "with intent to commit a crime against a person or property therein" he entered or remained unlawfully in a dwelling other than a vehicle. RCW 9A.52.025. The court determined that Wade was acting in concert with and as an accomplice to Patterson, Berhe, and Cody during all the crimes that took place on October 9 and concluded that Wade or an accomplice entered and remained unlawfully in the three homes and stole property from each home.

Wade likens this case to State v. Mace, 97 Wn.2d 840, 842-43, 650 P.2d 217 (1982), where the only evidence connecting the defendant to the residential burglary was a bag and receipt bearing the defendant's fingerprints found near an ATM machine where stolen bank cards were used. The evidence here, however, was far more substantial. For instance, the evidence related to cell phones and cell towers indicated that Wade was in contact with the other participants and was in the area of each burglary at the time it occurred. Wade was arrested a short time after the burglaries driving a car registered to his grandmother and associated with him that contained property stolen from each

14

residence, gloves, and a jacket that appeared to be his size containing shards of glass. The testimony of two eyewitnesses indicated that Wade was one of the group who entered the Reek and Wu residences. Finally, Wade acknowledged his involvement in the burglaries when he expressed his view that the potential punishment exceeded his culpability, because the group was merely "taking care of our folks" and no one was hurt. Sufficient evidence supports the court's determination that beyond a reasonable doubt Wade or an accomplice committed each of the burglaries.

RCW 9A.56.300 provides that a person "is guilty of theft of a firearm [when he] commits a theft of any firearm." With respect to each of the six firearms, the trial court concluded that Wade or an accomplice stole it from the Reek residence. It is undisputed that six firearms were missing from Reek's home after the burglary. Again, the cell tower evidence, eyewitness testimony, and Patterson's statement that he was with Wade, placed Wade and the Camry in proximity to the Reek home at the time of the burglary and indicated that Wade was one of the people inside the house removing property. The Camry contained other property taken from the Reeks' home. The testimony of eyewitnesses, including Detective Christiansen, established that Wade and the others stopped briefly at his grandmother's house shortly after the burglaries and removed some property from the Camry. All of this evidence supports the court's determination that Wade, along with the others, took firearms from the Reek home.

15

Here also, Wade's statements in the recorded jail telephone calls were damaging. It is true that Wade did not overtly admit to stealing firearms, nor expressly mention "guns" or "firearms." But, given the context of the conversations, it is clear that Wade was desperate to ensure that police would not locate the firearms taken from the Reek home or connect them to him.

Wade suggests a different interpretation and claims he was merely concerned about stolen property located in the Camry. But, Wade did not inquire about the Camry. He appeared to assume that it was in police custody. At certain points, Wade referred to the Camry as "the car," making no attempt to disguise the reference. Wade fails to explain why "Barney" refers to the Camry. Wade did not discuss the residential burglary, possession of stolen property, or any other charges that could result from the police finding stolen property in the Camry.

Wade was singularly focused on the charges stemming from the stolen firearms and whether those charges were viable if police did not locate the firearms. In one of the calls, Wade explained to Cody that he was specifically concerned after he learned that the police were watching when they stopped at Anderson's house and therefore likely knew that "Barney is involved." He therefore urged Cody to make sure the "dunt-dunt-da-dahs" were "[o]ut of Barney" and "further" away, "immediately." He expressed interest only in "Barney" or the "purple thing" and whether and to what extent it was "clean." The clear inference from the recorded jail calls is that Wade participated in stealing firearms from Reek's home. Even absent Patterson's statement that Wade

primarily handled the firearms, there was sufficient evidence to establish that Wade committed theft of a firearm as a principal or an accomplice.

Under RCW 9.41.040(1) a person commits unlawful possession of a firearm "if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted . . . of any serious offense." Wade does not dispute that he was previously convicted of a serious offense. A person actually possesses something that is in his or her physical custody, and constructively possesses something that is not in his or her physical custody, but is still within his or her "dominion and control." State v. Callahan, 77 Wn.2d 27, 29, 459 P.2d 400 (1969). For either actual or constructive possession, the prosecution must prove more than a passing control. State v. Staley, 123 Wn.2d 794, 801, 872 P.2d 502 (1994). While the ability to immediately take actual possession of an item can establish dominion and control, mere proximity to the item by itself cannot. Cf. State v. Jones, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002); State v. Spruell, 57 Wn. App. 383, 388, 788 P.2d 21 (1990). Factors supporting dominion and control include ownership of the item and, in some circumstances, ownership of the premises. State v. Tadeo-Mares, 86 Wn. App. 813, 816, 939 P.2d 220 (1997). Whether one has actual control over the item at issue depends on the totality of the circumstances. Staley, 123 Wn.2d at 802.

Wade claims there was no evidence that he exercised dominion and control over any firearm, and at most, the evidence indicated only proximity to the stolen guns. Wade relies on the Washington Supreme Court's recent decision in

State v. Davis, 182 Wn.2d 222, 340 P.3d 820 (2014). In Davis, both defendants were convicted of rendering criminal assistance and firearm possession charges based on their actions following Maurice Clemmons's notorious shooting of four Lakewood, Washington police officers. Id. at 224. Clemmons sustained a gunshot injury and stole a firearm from one of the officers he shot and killed. Id. at 224-25. After the shooting, Eddie Lee Davis drove Clemmons to Letrecia Nelson's home. Id. at 225. After Nelson let the two men inside, Clemmons told Nelson about the shooting and the stolen firearm and requested clean clothes and assistance in treating his wound. Id. While another person helped Clemmons with the wound, Nelson put clothes and the stolen firearm in a shopping bag. Id. at 227-28. Clemmons stayed at Nelson's home for approximately 15 minutes. Id. at 228. Just before leaving, Clemmons asked Davis, "'Where's the gun?'" Id. Davis responded that the gun was in a bag and handed the bag to Clemmons. Id.

A majority of the court determined that neither Nelson nor Davis exercised dominion and control over the firearm, because neither "asserted any interest" in the gun, but merely "briefly handled the item for Clemmons, the true possessor of the gun."[4] Id. at 235 (Stephens, J. dissenting). Critical to the court's conclusion were the circumstances of Clemmons's arrival and his tendency to control his family members. Id. While Clemmons was briefly distracted by other pressing issues while at Nelson's home and apparently did not know the gun had been placed in a bag, there was nothing to suggest he intended to transfer possession

---

[4] The four justice concurrence agreed with the dissent on this point.

or control. Id. at 237. Nelson's and Davis's actions amounted to "mere proximity to and momentary handling" of the contraband. Id. at 235.

The evidence here does not suggest that Wade momentarily handled the guns on behalf of a true possessor or that he was merely proximate to stolen firearms. Unlike Nelson and Davis, Wade stole the guns as a principal or an accomplice. Wade was the driver and exercised control over the Camry, used to transport the guns. Wade was the person who opened the trunk and manipulated the property within it. Wade's attempt to conceal items as he stood behind the trunk suggests that the items he was handling would be readily recognized as contraband. Wade appeared to be in charge of the initial distribution of the stolen firearms. It is reasonable to infer from this evidence that Wade exercised dominion and control over the guns. Wade continued to exercise control over the firearms after he was arrested, by directing Cody's actions with respect to them. Thus, here also, even absent Patterson's statement that Wade was the person who handled the guns, the evidence is sufficient to support the trial court's determination that he exercised dominion and control and therefore committed the crime of unlawful possession of a firearm.[5]

---

[5] At oral argument, Wade suggested that his conviction for unlawful possession of a firearm should be reversed because the trial court failed to make a specific finding that Wade physically possessed any gun at a specific point in time. However, when the findings are unclear or fail to address an important point, the appropriate remedy is remand and Wade does not request this remedy. See State v. Head, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998) (no findings prepared); see also State v. Alvarez, 128 Wn.2d 1, 19, 904 P.2d 754 (1995) (no bench trial findings on ultimate facts).

Finally, conviction for theft in the second degree requires proof that a person "commits theft of . . . [p]roperty or services which exceed(s) seven hundred fifty dollars in value." RCW 9A.56.040(1)(a). As explained, the evidence is sufficient to establish that Wade participated in each of the residential burglaries. Wade does not challenge the sufficiency of the evidence to establish that the value of the items stolen from the Vu home was more than $750. Sufficient evidence supports the court's verdict.

III. Offender Score

For the first time on appeal, Wade contends that the court erred when it failed to treat his six theft of a firearm convictions as the same criminal conduct for the purpose of calculating his offender score.

Although a criminal defendant may challenge an offender score for the first time on appeal, a defendant waives that right when the alleged error involves a factual dispute or trial court discretion. State v. Jackson, 150 Wn. App. 877, 892, 209 P.3d 553 (2009). Where a defendant is convicted of more than one crime, the sentencing court must make discretionary decisions in determining whether those crimes arose from the same criminal conduct. State v. Nitsch, 100 Wn. App. 512, 523, 997 P.2d 1000 (2000). Thus, by failing to raise the issue of same criminal conduct at sentencing, a defendant waives the right to argue that issue on appeal. State v. Jackson, 150 Wn. App. 877, 892, 209 P.3d 553 (2009).

Because Wade did not argue at sentencing that his offenses constituted the same criminal conduct, he cannot raise this issue for the first time on appeal.[6]

We affirm.

WE CONCUR:

---

[6] In any event, as the State points out, Wade's firearm convictions did not count as current offenses against each other due to the operation of RCW 9.94A.589(1)(c). And, with respect to Wade's offender score for the residential burglary and trafficking in stolen property counts, treating the firearm convictions as the same criminal conduct would not affect the standard ranges and Wade was sentenced to the bottom of the range on each count.

21