IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 85071-7-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| EDWIN VLADIMIR LOPEZ, | |
| Appellant. | |

BOWMAN, A.C.J. — A jury convicted Edwin Vladimir Lopez of rape of a child in the first degree, child molestation in the first degree, and child molestation in the second degree. Lopez appeals his convictions, arguing the court violated his right to confront witnesses and to be free from double jeopardy. Lopez also argues that the trial court erred by imposing a community custody condition mandating random urinalysis (UA) and breath analysis (BA) testing and by imposing a victim penalty assessment (VPA) and DNA collection fee. We affirm Lopez's convictions and community custody condition but remand for the trial court to strike the VPA and DNA collection fee from his judgment and sentence.

FACTS

Lopez and Angela Escobar married and had two daughters, J and G. G is about four years younger than J. Around 2014, Lopez and Escobar separated and divorced. After the divorce, J and G mostly lived with Escobar but spent two evenings during the week and every other weekend with Lopez.

In 2015, Lopez lived in a two-story house in Burien with his son, Anthony Lopez, and Anthony's[1] friend, Royal Brewster. At the time, J was about 7 years old. Anthony and Brewster lived in the basement of the house. Lopez's bedroom was upstairs on the second floor. When staying with Lopez, J and G shared a bedroom, also located upstairs.

In early December 2015, Brewster noticed a pair of the girls' shoes in the basement and took them upstairs to return them. When he went upstairs, Brewster saw that Lopez's bedroom door was "wide open." Inside Lopez's room he saw Lopez standing with J's hand on his exposed penis. Brewster was "disgusted" and walked away. Lopez appeared nervous, followed Brewster downstairs, and began to act overly friendly.

Brewster told Anthony about what he saw and eventually Escobar learned of the incident. She then reported it to the police and took J to the hospital. The police reported the incident to Child Protective Services (CPS) and both agencies began investigating. At the hospital, J participated in a forensic interview and a sexual assault examination. Pediatric nurse practitioner Joanne Mettler and Dr. Emily Brown performed the sexual assault examination.[2] During the examination, J denied that Lopez sexually assaulted her. Still, Mettler and Dr. Brown collected DNA swabs for a rape kit and conducted a pelvic examination.

---

[1] We refer to Anthony Lopez by his first name for clarity and intend no disrespect by doing so.

[2] Dr. Brown was a fellow in training at the time and Mettler was supervising her. They conducted J's examination "simultaneously together."

DNA testing of J's underwear revealed male DNA but was otherwise inconclusive.

After the report of sexual assault, Escobar restricted Lopez's contact with J and G. Lopez did not see the kids for about a year. Then, the police and CPS closed their investigations into the incident, and Lopez resumed supervised visits. Months later, the visits became unsupervised, but per Escobar's insistence, Lopez could not keep his daughters overnight. After the visits became unsupervised, Lopez began sexually assaulting J again. J said that Lopez assaulted her in his apartment "[a]lmost every time we would go see him."

Eventually, when J was about 12 or 13 years old, she realized that what Lopez was doing to her "didn't seem normal." And she "was tired of having to go over there and be[ ] treated like that," so she told Escobar that Lopez was sexually assaulting her. J explained that she did not come forward earlier, in part, because she did not understand that Escobar was abusing her, but also because Lopez made her promise not to tell. And she "was afraid that [her] little sister would have to grow up without a father" if she told anyone.

Escobar reported J's disclosure to the police, and J underwent a second forensic interview and sexual assault examination. The police then arrested Lopez. After G learned of the arrest, she disclosed that Lopez had been molesting her as well. G was about eight years old at the time.

As to J, the State charged Lopez with two counts of rape of a child in the first degree, one count of child molestation in the first degree, and one count of

child molestation in the second degree.[3]  The case proceeded to a jury trial.

At trial, Mettler testified about her 2015 examination of J.  She told the jury that J's legs shook while in the stirrups during the pelvic examination.  J also testified.  She told the jury about when Lopez molested her in his bedroom at the Burien house in 2015.  Brewster also testified about walking in on Lopez and J in Lopez's bedroom.  J testified that Lopez continued to molest and rape her in his Seattle apartment after his unsupervised visits resumed, including a time when Lopez molested her under a blanket in his bed.  And she described a time when Lopez raped her in his car while parked in her school's parking lot.

Lopez did not testify.  His attorney generally denied the allegations and argued the witnesses were not credible.

The jury convicted Lopez of one count of child rape in the first degree, one count of child molestation in the first degree, and one count of child molestation in the second degree.  But it acquitted Lopez of one count of child rape.  Lopez appeals.

## ANALYSIS

Lopez argues the trial court 1) violated his right to confrontation, 2) violated his right to be free from double jeopardy, 3) erred by imposing an unlawful community custody condition, and 4) that we should remand for the court to strike the VPA and DNA collection fees.  We address each argument in turn.

---

[3] As to G, the State amended the information to add another charge of child molestation in the first degree and another count of rape of a child in the first degree. The jury acquitted Lopez of the two counts related to G, so they are not at issue in this appeal.

1. <u>Confrontation Clause</u>

Lopez argues the trial court violated his right to confront witnesses when it allowed Mettler to testify about her observations of J during the 2015 pelvic examination. We disagree.

We review alleged confrontation clause violations de novo. *State v. Kronich*, 160 Wn.2d 893, 901, 161 P.3d 982 (2007), *overruled on other grounds by State v. Jasper*, 174 Wn.2d 96, 271 P.3d 876 (2012); *State v. McDaniel*, 155 Wn. App. 829, 839, 230 P.3d 245 (2010). The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to confront and cross examine witnesses. The confrontation clause prohibits testimonial out-of-court statements of an absent witness unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Whether a statement is testimonial depends on whether the speaker's primary purpose was to create an out-of-court substitute for trial testimony. *State v. Scanlan*, 193 Wn.2d 754, 766, 445 P.3d 960 (2019).

Here, Mettler testified about J's demeanor during the genital portion of the sexual assault exam. She said:

> I'm going to look at my report to refresh my memory. So, during the exam, [J] was cooperative. However, during the genital exam, she—her legs were shaking when they were in the stirrups.

Because Mettler testified to her own observation of J and was present at trial for Lopez to cross-examine her, Lopez fails to show a violation of his confrontation

5

right.

Still, Lopez argues the record shows Mettler did not testify from her own observations. According to Lopez, Mettler testified about Dr. Brown's observations during the pelvic examination. But Mettler explained that she was training and supervising Dr. Brown during J's examination. And she and Dr. Brown were both present during the entire examination. Mettler performed one part of the examination and Dr. Brown performed the other. After the exam, Mettler wrote one portion of the report and Dr. Brown wrote the other. Then, both Mettler and Dr. Brown read the entire report to ensure its accuracy and signed it. While Mettler testified that she had no independent recollection of the event, she also said the report would refresh her recollection. And, after looking at the report, Mettler testified from her own memory of the event.[4]

Because Mettler testified about her own observations and was present for cross-examination, the trial court did not violate Lopez's right to confront witnesses.

2. Double Jeopardy

Lopez argues that his convictions for both child molestation in the first degree and child molestation in the second degree violate his right to be free from double jeopardy. We disagree.

We review double jeopardy claims de novo. *State v. Arndt*, 194 Wn.2d 784, 815, 453 P.3d 696 (2019). A court violates a defendant's right to be free

---

[4] Lopez also argues that Mettler's statements amount to inadmissible hearsay. But Mettler testified about her own observations. So, she did not repeat an out-of-court statement and did not testify to hearsay. *See* ER 801(c), (d).

from double jeopardy when it imposes multiple punishments for the "same offense." *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991). To avoid exposing a defendant to double jeopardy, the trial court must instruct a jury that to convict a defendant charged with multiple counts of the same crime arising from several acts, the jury must determine that each crime involved facts "separate and distinct" from the other. *See State v. Mutch*, 171 Wn.2d 646, 662-63, 254 P.3d 803 (2011). It is not enough to instruct the jury only that it must decide each count separately and that its verdict on one count should not control its verdict on any other count. *Id.*

Still, flawed jury instructions create only a "possibility of a double jeopardy violation." *Mutch*, 171 Wn.2d at 663. If, viewing the record as a whole, it is " '*manifestly apparent* to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act," there is no double jeopardy violation. *Id.* at 664[5] (quoting *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008), *abrogated on other grounds by Mutch*, 171 Wn.2d at 646).

*Mutch* is instructive. In that case, a jury convicted the defendant of five counts of rape. *Mutch*, 171 Wn.2d at 652. The court read to the jury five "nearly identical" to-convict instructions that included the same charging period. *Id.* at 662. The court also instructed the jury that " '[a] separate crime is charged in each count. You must decide each count separately. Your verdict on one count

---

[5] Alteration in original.

should not control your verdict on any other count.' " *Id.*[6]  The defendant appealed the verdicts, arguing the jury instructions were vague and allowed for the possibility of five convictions based on one act.  *Id.*

Our Supreme Court agreed that the jury instructions were flawed because they failed to explain to the jury that a " 'separate and distinct' " act must support each count.  *Mutch*, 171 Wn.2d at 663.  Still, the court concluded that it must look beyond the jury instructions to determine whether an actual double jeopardy violation occurred.  *Id.* at 664.  So, it looked to "the entire trial record" to consider whether it was manifestly apparent to the jury that the State was not seeking to impose multiple punishments for the same offense.  *Id.*

A review of the record showed that the victim testified about five separate incidents of rape.  *Mutch*, 171 Wn.2d at 665.  And in its arguments, the State discussed and distinguished all five acts.  *Id.*  Finally, the defense did not argue that there was insufficient evidence for any of the rapes.  *Id.*  Instead, defense counsel argued that the victim consented.  *Id.*  Based on the entire record, the court held that despite the deficient jury instructions, it was "manifestly apparent" to the jury that each count of rape represented a separate act, so no double jeopardy violation occurred.  *Id.* at 665-66.

Our Supreme Court applied the same test in *State v. Peña Fuentes,* 179 Wn.2d 808, 318 P.2d 257 (2014).  In *Peña Fuentes*, a jury convicted the defendant of one count of first degree rape of a child and two counts of first degree child molestation that occurred over about 35 months.  *Id.* at 823.  The

---

[6] Alteration in original.

jury instructions for the rape charges did not include an instruction that the rape must have occurred on separate and distinct occasions from the molestation charges. *Id.* But in closing argument, the State "clearly" identified the specific acts that supported each charge. *Id.* at 825. And it detailed the alleged conduct supporting each count and distinguished them by time and place. *Id.* Further, the defendant did not challenge the number of acts or whether the acts overlapped. *Id.* at 825-26. Instead, he challenged only the witness' credibility. *Id.* Based on the entire record, our Supreme Court found that while the instructions were improper, it was manifestly apparent that the jury convicted the defendant based on separate and distinct acts. *Id.* at 826.

This case is like *Mutch* and *Peña Fuentes*. The trial court erred when it did not instruct the jury that it must rely on "separate and distinct" acts to convict Lopez of child molestation as charged in counts III and IV.[7] But the record shows the State made it manifestly apparent to the jury that each count arose from a separate act.

In closing argument, the prosecutor identified the specific acts that supported each count, including count III and count IV. The prosecutor discussed the incident in the Burien house where Brewster walked in on Lopez with J. The prosecutor told the jury that Brewster "saw with his own eyes the act that is charged in Count III, which is Child Molestation in the First Degree." Later in closing argument, the prosecutor again reiterated that count III was "the

---

[7] While count III is charged as child molestation in the first degree and count IV is charged as child molestation in the second degree, the evidence could support that both acts occurred when J was under the age of 12.

incident that [Brewster] saw." The prosecutor also discussed J's recollection of the incident in Lopez's Seattle apartment on the bed and said "[t]hat incident can be used for Count IV, Child Molestation in the Second Degree." And he later discussed count IV as the incident where J was under the blanket in the Seattle apartment.

Further, like the defendant in *Peña Fuentes*, Lopez's defense focused on the witnesses' credibility, not the number of child molestations or whether they overlapped. On this record, it was manifestly apparent to the jury that the State sought convictions for two counts of child molestation based on separate and distinct acts that occurred at different times and in different locations.

Lopez's convictions for two counts of child molestation did not violate his right to be free from double jeopardy.

3. Community Custody Condition

Lopez challenges the trial court's imposition of community custody condition 10, mandating random UA and BA testing. He argues that the condition impedes his privacy interests under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution and is not narrowly tailored to serve a legitimate government purpose. We disagree.

We review the imposition of community custody conditions for an abuse of discretion and reverse the conditions if they are manifestly unreasonable. *State v. Nguyen*, 191 Wn.2d 671, 678, 425 P.3d 847 (2018). A trial court's imposition

of an unconstitutional condition is manifestly unreasonable. *Id.* (citing *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008)).

Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, "the court may order an offender to . . . [c]omply with any crime-related prohibitions." RCW 9.94A.703(3)(f). A "crime-related prohibition" prohibits "conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(1). The SRA also mandates that unless waived by the court, an offender must "[r]efrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions." RCW 9.94A.703(2)(c). And, "[a]s part of any community custody, the court may order an offender to . . . [r]efrain from possessing or consuming alcohol." RCW 9.94A.703(3)(e). So, the SRA expressly authorizes community custody conditions ordering an offender to refrain from controlled substance and alcohol use.

Our state constitution guarantees that "[n]o person shall be disturbed in [their] private affairs . . . without authority of law." WASH. CONST. art. I, § 7. But "probationers do not enjoy constitutional privacy protection to the same degree as other citizens." *State v. Olsen*, 189 Wn.2d 118, 124-25, 399 P.2d 1141 (2017). Similarly, a person on community custody has a reduced expectation of privacy. *State v. Nelson*, ___ Wn.3d ___, 565 P.3d 906, 917 (2025). But those persons still have a diminished expectation of privacy in the nonconsensual removal of their bodily fluids. *Id.* And the State's attempt to enforce BA and UA testing during a person's term of community custody implicates these reduced

privacy interests. *Id.* This intrusion on a person's lower expectation of privacy is " 'constitutionally permissible only to the extent necessitated by the legitimate demands' of community custody." *Id.*[8] (quoting *Olsen*, 189 Wn.2d at 125).

In *Nelson*, the defendant pleaded guilty to three counts of third degree rape of a child, communication with a minor for immoral purposes, and second degree child molestation. 565 P.3d at 909. The court imposed several community custody conditions, including that he not consume alcohol, marijuana, or nonprescribed drugs. *Id.* at 910. To ensure compliance with those conditions, the court ordered that the defendant submit to BA and UA testing. *Id.* The defendant appealed, arguing that the BA and UA conditions impermissibly interfered with his constitutional right to privacy because they were not crime related. *Id.* at 911. Our Supreme Court disagreed, holding that the authority of law supports the BA and UA testing conditions because they were narrowly tailored to monitor the defendant's compliance with his lawful statutorily imposed conditions—the prohibition on alcohol and drugs. *Id.* at 917-18.

This case is like *Nelson*. The trial court ordered that Lopez "[n]ot possess or consume controlled substances except pursuant to lawfully issued prescriptions" and that he "not consume alcohol." Lopez objected to neither condition. To ensure compliance with those lawfully imposed conditions, the court also ordered that Lopez "[b]e available for and submit to [UA] and/or [BA] upon request of the [community corrections officer] and/or chemical dependency treatment provider." That condition is narrowly tailored to monitor compliance

---

[8] Internal quotation marks omitted.

with the validly imposed conditions mandating Lopez to not consume controlled substances or alcohol.

The court did not abuse its discretion by imposing UA and BA testing to monitor and enforce Lopez's lawfully imposed conditions.

4. VPA and DNA Collection Fee

Lopez argues that we should remand for the trial court to strike his $500 VPA and $100 DNA collection fee. The State "does not oppose remand solely to strike the VPA and DNA fee."

The trial court sentenced Lopez on March 3, 2023. It imposed a VPA and DNA collection fee, which were mandatory at the time, and waived all discretionary fees. That same day, the trial court found Lopez indigent for purposes of appeal. Lopez then filed a notice of appeal on March 8.

Four months later on July 1, 2023, an amendment to RCW 7.68.035 took effect, providing that the court "shall not impose the [VPA] under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). The legislature also amended RCW 43.43.7541 and eliminated the previously mandated $100 DNA collection fee. LAWS OF 2023, ch. 449, § 4. As amended, the court must waive any fee imposed before July 1, 2023 for the collection of the offender's DNA. RCW 43.43.7541(2).

The State concedes the legislative amendments entitle Lopez to have his fees stricken under RCW 7.68.035(4) and RCW 43.43.7541(2). *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) ("Although [the] amendment

13

[to RCW 7.68.035(4)] will take effect after [the defendant]'s resentencing, it applies . . . because this case is on direct appeal."), *review granted*, 4 Wn.3d 1009, 564 P.3d 547 (2025).  We accept the concession.

We affirm Lopez's convictions and community custody condition but remand for the trial court to strike the VPA and DNA collection fee from his judgment and sentence.

_____, ACJ

WE CONCUR:

Feldman, J.